Filed 9/15/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

|  |  |
|---|---|
| SHARP IMAGE GAMING, INC., | C070512 |
| Plaintiff and Respondent, | (Super. Ct. No. PC20070154) |
| v. |  |
| SHINGLE SPRINGS BAND OF MIWOK INDIANS, |  |
| Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of El Dorado County, Nelson Keith Brooks, Judge. Reversed and remanded with directions.

DENTONS US, Paula M. Yost and Ian R. Barker; KERR & WAGSTAFFE, James M. Wagstaffe, Daniel A. Zaheer and Kevin B. Clune; and Mary Kay Lacey for Defendant and Appellant.

Robert G. Dreher, Assistant Attorney General, John L. Smeltzer, Aaron P. Avila and Avi M. Kupfer for United States Department of Justice as Amicus Curiae on behalf of Defendant and Appellant.

DLA PIPER, Matthew R. Jacobs, Steven S. Kimball and Todd M. Noonan for Plaintiff and Respondent.

In this case, we reverse a judgment related to contractual claims that are preempted by the Indian Gaming Regulatory Act (IGRA).

Defendant Shingle Springs Band of Miwok Indians (the Tribe) appeals from a judgment after trial in favor of plaintiff Sharp Image Gaming, Inc. (Sharp Image), in plaintiff's breach of contract action stemming from a deal to develop a casino on the Tribe's land. On appeal, the Tribe argues: (1) the trial court lacked subject matter jurisdiction because Sharp Image's action in state court was preempted by IGRA; (2) the trial court erred in failing to defer to the National Indian Gaming Commission's (NIGC) determination that the disputed Equipment Lease Agreement (ELA) and a promissory note (the Note) were management contracts requiring the NIGC's approval; (3) Sharp Image's claims were barred by the Tribe's sovereign immunity; (4) the trial court erred in denying the Tribe's motion for summary judgment; (5) the jury's finding that the ELA was an enforceable contract was inconsistent with its finding that the ELA left essential terms for future determination; and (6) substantial evidence does not support the jury's verdict on the Note.

After the parties completed briefing in this case, we granted permission to the United States to submit an amicus curiae brief in partial support of the Tribe on the questions of preemption and lack of subject matter jurisdiction. The United States asserted that the trial court could only exercise jurisdiction over Sharp Image's breach of contract claim "upon a determination that the unapproved ELA was not a management contract, a legal determination that the [trial court] never made." The United States further argues that based on the NIGC's legal determination that the ELA was an unapproved management contract and therefore void, the trial court should have dismissed this case under the doctrine of preemption. The United States urges us to defer to the NIGC's interpretation of its own regulations, contending that the agency's reasonable interpretation is entitled to "substantial deference." Lastly, the United States contends that the Note was an unapproved collateral agreement to a management contract

2

subject to IGRA and as such, Sharp Image's claims related to the Note are also preempted.

We conclude that IGRA preempts state contract actions based on unapproved "management contracts" and "collateral agreements to management contracts" as such agreements are defined in the IGRA regulatory scheme.  Thus, the trial court erred by failing to determine whether the ELA and the Note were agreements subject to IGRA regulation, a necessary determination related to the question of preemption and the court's subject matter jurisdiction.  We further conclude that the ELA is a management contract and the Note is a collateral agreement to a management contract subject to IGRA regulation.  Because these agreements were never approved by the NIGC Chairman as required by the IGRA and were thus void, Sharp Image's action is preempted by IGRA.  Consequently, the trial court did not have subject matter jurisdiction.[1]

We reverse.

## BACKGROUND

## Indian Gaming Regulatory Act

The Supreme Court has consistently "recognized Indian tribes as 'distinct, independent political communities,' [citation], qualified to exercise many of the powers and prerogatives of self-government." (*Plains Commerce Bank v. Long Family Land & Cattle Co.* (2008) 554 U.S. 316, 327 [171 L.Ed.2d 457, 471].)  Accordingly, the tribes may establish their own law with respect to "internal and social relations." (*Ackerman v. Edwards* (2004) 121 Cal.App.4th 946, 951.)  "This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. . . .  '[W]ithout

---

[1]  Because we agree with the Tribe and the United States that federal law preempts Sharp Image's state law claims and the trial court thus lacked subject matter jurisdiction, we need not reach the Tribe's other claims on appeal.

3

congressional authorization,' the 'Indian Nations are exempt from suit.' " (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 115].)

One area where Congress has exercised its plenary authority is IGRA. (25 U.S.C. § 2701 et seq.) When enacting IGRA, Congress recognized that "numerous Indian tribes [had] become engaged in . . . gaming activities . . . as a means of generating tribal governmental revenue." (25 U.S.C. § 2701(1).) Congress further observed that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." (25 U.S.C. § 2701(5).) Congress enacted IGRA to "provide a statutory basis for the operation of [Indian] gaming" as a means to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments" (25 U.S.C. § 2702(1)), but also to "shield [tribes] from organized crime and other corrupting influences, to ensure that [tribes are] the primary beneficiary of . . . gaming operation[s], and to assure that gaming is conducted fairly and honestly by both the operator and the players." (25 U.S.C. § 2702(2).)

IGRA divides Indian gaming into three classes. Here we are concerned with class III gaming, which includes casino games played against the house such as blackjack and roulette, slot machines, and pari-mutuel betting such as horse racing and all other forms of gaming that are not class I gaming ("social games solely for prizes of minimal value" or traditional games associated with tribal ceremonies) or class II gaming (bingo and card games in which gamblers play against one another rather than against the house). (25 U.S.C. § 2703(6)-(8); *Wells Fargo Bank v. Lake of the Torches* (7th Cir. 2011) 658 F.3d 684, 687-688 (*Wells Fargo*).) Tribes are permitted to have class III gaming under the following conditions: (1) the gaming is conducted under a tribal ordinance that meets specified statutory requirements and that has been approved by the chairman of the NIGC (25 U.S.C. § 2710(d)(1)(A)); (2) the gaming is located in a state that otherwise permits

such gaming (25 U.S.C. § 2710(d)(l)(B)); and (3) the gaming is conducted in "conformance with a Tribal-state compact" between the tribe and the state where the gaming will occur (25 U.S.C. § 2710(d)(1)(C)).

IGRA created the NIGC within the Department of the Interior (25 U.S.C. § 2704(a)), and granted the NIGC broad regulatory powers to implement and enforce IGRA (25 U.S.C. § 2706(a)-(b)), including the power to promulgate "appropriate" regulations (25 U.S.C. § 2706(b)(10)). The NIGC "oversees regulation, licensing, background checks of key employees, and other facets of gaming. [Citation.] It is the NIGC that must approve license applications, management contracts, and tribal gaming ordinances." (*American Vantage Companies v. Table Mountain Rancheria* (2002) 103 Cal.App.4th 590, 595-596 (*American Vantage*).)

Among its various powers, the NIGC has full authority over "management contracts." Under IGRA, an Indian tribe may enter into a management contract for the operation of class II or class III gaming activity if such contract has been submitted to, and approved by, the Chairman. (25 U.S.C. §§ 2710(d)(9), 2711(a)(1).) Under IGRA regulations promulgated by the NIGC, "[m]anagement contract means any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." (25 C.F.R. § 502.15.) Further, a "management contract . . . shall be considered to include all collateral agreements to [the management contract] that relate to the gaming activity." (25 U.S.C. § 2711(a)(3).) The term "[c]ollateral agreement means any contract, whether or not in writing, that is related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or any person or entity related to a management contractor or subcontractor)." (25 C.F.R. § 502.5.) Management contracts "shall become effective upon approval by the Chairman" of the NIGC (25 C.F.R.

5

§ 533.l(a)), and "[m]anagement contracts . . . that have not been approved by the . . . Chairman . . . are void" (25 C.F.R. § 533.7).[2]

Once the NIGC determines, in a final agency action, that it possesses authority over a particular Indian gaming contract, that decision is entitled to binding and preclusive legal effect "unless and until" it is successfully challenged in a federal district court pursuant to section 2714.[3]  (*AT & T Corp. v. Coeur d'Alene Tribe* (9th Cir. 2002) 295 F.3d 899, 905, 908 (*AT&T*), boldface omitted [NIGC approval of a management contract and tribal resolution are final agency actions subject to review only in federal court under the Administrative Procedures Act].)  Because the NIGC determination is a federal administrative action, judicial review of the NIGC's determination of whether a contract is subject to its authority is within the exclusive jurisdiction of the federal courts. (25 U.S.C. § 2714; *U.S. ex rel. Saint v. President* (2d Cir. 2006) 451 F.3d 44, 51 (*Saint*).)

When establishing the pre-approval statute for IGRA management contracts, Congress referenced section 81 of title 25 of the United States Code, an existing pre-approval requirement for any contracts "relative to [Indian] land."  (25 U.S.C. § 81.) At that time, section 81 of title 25 of the United States Code provided that "[n]o agreement shall be made by any person with any tribe of Indians, . . . in consideration of services for said Indians relative to their lands, . . . unless such contract or agreement be . . . approved" by the Secretary of the Interior.  IGRA expressly transferred the Secretary of the Interior's authority under section 81 to the NIGC "relating to [IGRA] management

---

[2]  In full, 25 Code of Federal Regulations part 533.7 reads:  "Management contracts and changes in persons with a financial interest in or management responsibility for a management contract, that have not been approved by the Secretary of the Interior or the Chairman in accordance with the requirements of this part, are void."

[3]  Section 2714 of title 25 of the United States Code provides in pertinent part: "Decisions made by the Commission pursuant to sections 2710 [and] 2711 . . . of this title shall be final agency decisions for purposes of appeal to the appropriate Federal district court."  We discuss relevant provisions in sections 2710 and 2711, *post*.

6

contracts." (25 U.S.C. § 2711(h); *Saint, supra*, 451 F.3d at p. 48.) Based on this legislative history, courts have long held that federal approval of contracts falling under section 81 of title 25 of the United States Code is an "absolute prerequisite to . . . enforceability." (*A.K. Management Co. v. San Manuel Band of Mission Indians* (9th Cir. 1986) 789 F.2d 785, 789.) A void contract under section 81 of title 25 of the United States Code "cannot be relied upon to give rise to any obligation by the [tribe]." (*A.K. Management Co.*, at p. 789; accord, *Quantum Entertainment v. Dept. of the Interior* (D.C. Cir. 2013) 714 F.3d 1338, 1343-1344.) When enacting IGRA, Congress established the same rule for unapproved management contracts. (See *Catskill Development v. Park Place Entertainment* (2d Cir. 2008) 547 F.3d 115, 127-130 (*Catskill*).) "[T]he statute provides for pre-screening of contracts between the tribes and parties desiring to establish business relationships with the tribes that might impair [the] fundamental purpose of the federal statutory scheme, and *it is this comprehensive review that constitutes the core of Congress's protection for Indian gaming establishments*." (*Wells Fargo, supra*, 658 F.3d at p. 700, italics added.)

## The Tribe's Reservation

The Tribe is a federally recognized Indian Tribal government with a reservation situated on the Shingle Springs Rancheria in El Dorado County (the Reservation). (See 25 U.S.C. § 479a-l; 77 Fed.Reg. §§ 47868, 47871 (Aug. 10, 2012).) When the State of California realigned Highway 50 during the 1960s, the Tribe's Reservation lost access to and from public roadways. While the original plans for the realignment proposed a tunnel underneath Highway 50 connected to the Reservation, the plans for building the tunnel were ultimately cancelled and the Reservation was effectively landlocked except for access through Grassy Run Road, a private road in a residential subdivision that dead-ended at the Reservation. Owned and controlled by the Grassy Run Homeowners' Association, the Tribe was prohibited from using the road for any commercial purpose, and was only allowed to use the road for residential and limited governmental purposes.

7

Due to its landlocked location, the Tribe was initially unable to develop commercial gaming on the Reservation.

**The Disputed Agreements**

In 1996, Sharp Image met with the Tribe about developing a gaming venture. At the time, Sharp Image was supplying gaming machines to approximately 25 Indian casinos in California. Despite the lack of access to the Reservation on public roads, Sharp Image and the Tribe entered agreements to develop gaming on the Reservation.

The first was the Gaming Machine Agreement (GMA), entered on May 24, 1996, which required Sharp Image to fund a casino, to be known as Crystal Mountain Casino. Pursuant to the GMA, Sharp Image agreed to advance "all funds necessary" for the "immediate construction" of a temporary casino under a tent, as well as all funds necessary for the "acquisition of all equipment" and furnishings "related to the interior or operation of the Casino." Sharp Image also agreed to "advance monies on behalf of the Tribe for construction of a larger Casino facility." In exchange, the Tribe agreed to repay all monies advanced by Sharp Image at an annual interest rate of 12 percent with the repayment terms for any advances to be "set forth at a later date."

In addition, the GMA stated Sharp Image would provide the Tribe with up to 400 gaming machines in the new facility and further provided that Sharp Image would maintain the exclusive right to supply all gaming machines located and operated within any of the Tribe's casinos or its gaming establishments during the term of the agreement. The term of the agreement was five years, but it would be extended two years if the Tribe did not exercise the option to purchase the machines at the end of the initial five-year term. The GMA further provided that Sharp Image "shall maintain complete responsibility with regards to promotions for the Casino and provide direction for the General Manager in this department."

Under the GMA, the Tribe would pay Sharp Image 30 percent of the net revenues "derived by the Tribe from the Equipment." It defined net revenues to mean "all gross

revenues received by the Tribe in connection with its operation of all Machines or Table games on the Casino premises or Reservation, minus all jackpots or payouts made through such Equipment."

Pursuant to the GMA, the Crystal Mountain Casino opened as a temporary tent structure with Sharp Image's gaming machines on October 4, 1996, but it was shut down after one night for safety reasons. The Tribe "had gotten word that there [were] problems with the operation and that the [NIGC] was going to issue an order to shut down." Among other issues, there were fire safety concerns about the temporary tent structure and furnishings, and concerns about emergency access on the narrow road to the casino.[4]

Shortly after the casino's closure, on November 5, 1996, general counsel for the NIGC, Michael Cox, sent a letter to the Tribe's Chairman, William D. Murray, declaring the GMA "null and void." The NIGC concluded Sharp Image had supplied gaming machines, class III machines under IGRA, which were illegal without an effective tribal-state compact in place, and which the Tribe did not then have. Crystal Mountain Casino reopened in the spring of 1997, without the gaming machines, but it was unsuccessful and closed within months.

On June 18, 1997, the President of Sharp Image, Chris Anderson, sent a letter to Chairman Murray proposing new contracts to replace the GMA: the ELA and the Note. The ELA and the Note were enclosed with the letter. The letter stated, that the ELA and Note "represent *a more complete agreement* between Sharp Image Gaming, Inc. and the Shingle Springs Rancheria." (Italics added.) It further stated, "These instruments incorporate the points of the original [GMA] agreement, but further address some points that benefit both parties in having formalized." The letter also explained, "The promissory note, which we have delayed in submitting, incorporates the total owed as of

_____

[4] At a later point in time, a neighborhood association sued in federal court, obtaining a ruling that the road is a private road and prohibiting its use for commercial purposes.

May 31, 1997." The letter further stated that the ELA and the Note were produced by Cox, "former lead counsel for the NIGC," who had sent the November 1996 letter to the tribe advising that the GMA was null and void. Cox was by this time working for Sharp Image.

Subsequently, Anderson attended a Tribal Council meeting on November 15, 1997. The meeting minutes reflect, and Anderson confirmed in his trial testimony, that Sharp Image was attempting to solve the Tribe's access problem by "purchas[ing] property to provide an easement to the Rancheria." According to the minutes, Anderson stated that he had "purchased property to provide an easement to the Rancheria" and expected that the casino would reopen within months, by January 1, 1998. At the end of the meeting, the Tribal Council approved the ELA and the Note. The ELA, was entered on the day of the Tribal Council meeting, November 15, 1997, along with the Note, to replace the GMA.

The ELA provided a lease term of five years to "commenc[e] on the date that 400 gaming devices" to be provided by Sharp Image were "installed and in operation at Lessor's [Sharp Image] Crystal Mountain Casino or any other gaming facility owned and operated by Lessee [the Tribe]." Additionally, the ELA gave Sharp Image the right to provide the "video gaming devices" to the Tribe (the Equipment), as well as the "exclusive right" to "supply additional gaming devices . . . to be used at its existing or any future gaming facility or facilities." As with the GMA, the term would be automatically extended two years if at the end of the five-year term, the Tribe did not purchase the machines Sharp Image had provided. In addition to the gaming devices, the ELA stated that Sharp Image would provide progressive hardware and software, as well as signage for the gaming devices and "fiber optic signs for placement throughout any gaming facility owned and operated" by the Tribe.

Similar to the GMA, the lease payments were fixed at 30 percent of net revenues from the equipment, defined as "gross gaming revenues from all gaming activities, which

10

are solely related to the operation of Video Gaming/Pulltab devices and card games, less all prizes, jackpots and payouts." (Italics added.) Also, the ELA gave Sharp Image the right to inspect the books, and in the event of an audit, Sharp Image could select the auditor if the parties could not agree on who would conduct the audit.

Different from the GMA, the ELA contained a list of "[e]vents of [d]efault" by the Tribe. The ELA did not include a list of events relative to default by Sharp Image. Also, in the event of default by the Tribe, the ELA contained a list of remedies available to Sharp Image, but no similar list of remedies is set forth for the Tribe in the event of a default by Sharp Image.

In the Note, the Tribe acknowledged the total amount previously invested to develop Crystal Mountain Casino was $3,167,692.86. The Note stated this was "the full amount owed up to September 30, 1997," and that the "principal sum" of the Note was "not to exceed" this amount. The Note further provided that the Tribe would repay sums already advanced by Sharp Image to develop the Crystal Mountain Casino, and future sums advanced for casino development, at an annual interest rate of 10 percent. Like the ELA, the Note also referenced "four hundred (400) video gaming devices," and provided that repayment was to "commence . . . following the date that four hundred (400) video gaming devices . . . are installed and in operation at Borrower's Gaming Facility and Enterprise."[5] The Note further provided that the principle and interest was to be fully amortized over twelve months and paid in equal monthly installments to commence two months after installation of the gaming devices.

---

[5] Inexplicably, the ELA refers to Crystal Mountain Casino as the "Lessor's Crystal Mountain Casino" and defines "Lessor" as Sharp Image, yet the Note refers to "Borrower's Gaming Facility and Enterprise" and defines "Borrower" as the Tribe. We assume the reference to "*Lessor*'s Crystal Mountain Casino" in the ELA is a typographical error because neither the Tribe, nor amicus make anything of it. (Italics added.)

As did the GMA, the ELA and the Note both stated that the Tribe "expressly waives its sovereign immunity from any suit, action or proceeding," in California state or federal courts, "to enforce [the Tribe's] obligations . . . for any claims arising out of this lease." Also, the ELA stated that the Tribe was "solely responsible for the management of [its] gaming facility," that the parties did not intend the ELA to "constitute a management contract," and that "nothing in [the ELA] authorizes [Sharp Image] to manage all or part of [the Tribe's] gaming facility."

**Repudiation of the ELA**

Due to the ongoing road access issues, the Crystal Mountain Casino never reopened, and consequently, the revenues needed to build a larger, permanent facility were never generated. Also, Sharp Image never "installed" or put "in operation" 400 gaming machines at Crystal Mountain Casino. Additionally, the parties sought other investors after Sharp Image was unable to invest further resources in developing gaming on the Rancheria.

In early 1999, Anderson introduced Lakes Gaming (Lakes), to the Tribe as a potential investor and manager. Anderson testified that he had heard Lakes was a "management company." During these negotiations, Sharp Image asserted an exclusive right, under the ELA, to supply gaming equipment to any future facility and sought to sell this interest to Lakes for $75 million. On June 11, 1999, the Tribe adopted a resolution to approve the development and management agreements with Kean-Argovitz Resorts (KAR), which were entered on the same date. Anderson testified that KAR offered to buy out Sharp Image's interest for $35 million, which he refused.

In June 1999, after receiving informal advice from the NIGC[6] that its contracts with Sharp Image were invalid, the Tribe repudiated its contracts with Sharp Image. In a June 1, 1999, letter from the Tribe to Anderson, the Tribe advised that it believed Sharp Image breached two provisions of the GMA and left the Tribe with outstanding debt. This letter also made reference to an attached letter from NIGC that "leaves doubt as to the validity of the Agreement with NIGC and BIA."[7] In a letter to Anderson dated a day later, June 2, 1999, the Tribe said that based on information from the NIGC and Bureau of Indian Affairs (BIA), it believed that the "Gaming Machine Agreements" may be invalid.[8] The letter further advised that the Tribe was concerned about "Sharp Image's failure to meet certain financial requirements," asserting that the Tribe had accumulated debt related to gaming activities which Sharp Image had agreed to pay pursuant to the GMA and Anderson's personal affirmation.

On June 9, 1999, Cox sent a letter to the Tribe asserting that Anderson "expended approximately nine million dollars in a three-year effort to assist the Tribe in developing a gaming operation, fighting the NIGC's efforts to prevent the gaming operation from opening, litigating the Tribe's right of access to its reservation, purchasing parcels of land in the Grassy Run Subdivision to provide an alternative route into the reservation and paying the salaries of tribal employees at the Tribe's casino that is closed for business." Cox told the Tribe it was free to submit their agreements to the NIGC or BIA for review and expressed confidence that "neither Agreement" falls within either agency's

---

[6] The Tribe's May 15, 1999, meeting minutes make reference to a meeting tribal representatives had in Washington, D.C., with "NIGC and BIA gaming management" at which they were informed the agency would not approve the "[c]ontract as written."

[7] The letter attached to the June 1, 1999, letter to Anderson is not in the record.

[8] The letter referred to the agreements in the plural, but did not specifically reference the ELA or the Note.

jurisdiction. Sharp Image asserted that the agreements were not management contracts subject to IGRA but "essentially equipment lease and financing agreements" and accordingly, "neither Agreement" required approval of the NIGC or the BIA. Finally, Sharp Image asserted it was not its "intent to prevent the Tribe from negotiating an agreement with a gaming management company. Sharp [Image] recognizes that in order for that to occur there must be some type of modification to [Sharp Image]'s prior Agreements with the Tribe. That can only occur, however, if there [are] good faith negotiations by all concerned parties. Questioning the legality of these Agreements can only poison the negotiations process."

On June 28, 1999, the Tribe sent Anderson another letter stating the all of the agreements were "void" because they would not receive necessary federal approvals. The Tribe stated its position was based primarily on IGRA. The Tribe asserted, "Sharp [Image] and Mr. Anderson were given wide latitude in developing a gaming operation on tribal lands, despite the fact as you have pointed out that [Sharp Image]'s agreement was a machine lease contract. Unfortunately, these actions have only [led] to further restrictions on Tribal sovereignty and increasing debt for the Tribe. [Sharp Image]'s proposed solutions to these problems seem to only result in more debt. It is these realities which have [led] the Tribe to seek other alternatives." Anderson testified that his contract was "cancelled" and he was told that the Tribe would no longer do business with him.

Lakes, KAR, and the Tribe began construction of the Red Hawk Casino in 2007. Anderson testified that he waited until 2007 to file suit—eight years after the Tribe repudiated the contract—because that is when it first appeared the Tribe would have the financial assets to pay a judgment.

## Procedural History

### Sharp Image's Complaints

Sharp Image filed its original complaint on March 12, 2007. It alleged that the Tribe breached the GMA, the ELA, the Note, and a series of oral agreements purportedly entered later regarding the repayment of advances made after the Note was executed. In the original complaint, Sharp Image alleged, inter alia, that while "the time for [the Tribe's] payment of monies under the contracts has not yet commenced, [the Tribe] has unequivocally repudiated its obligations under the contracts." Sharp Image subsequently filed a first amended complaint adding the allegation that the "Tribal Council" waived its sovereign immunity. A second amended complaint appears in the record[9] with causes of action based only on the ELA and the Note.

### NIGC Opinion Letter

About a month after Sharp Image filed its original complaint, the Tribe asked the NIGC to review the GMA and ELA to determine the status of the agreements under federal law. On April 13, 2007, the Tribe's counsel sent a letter to the NIGC's Acting General Counsel, Penny Coleman, stating that the Tribe believed the GMA and ELA to be void management contracts granting Sharp Image an illegal proprietary interest in the Tribe's gaming operations. The letter further stated, "[A]s recommended by NIGC Bulletin 93-3,[10] the Agreements are being submitted to your office for review to

---

[9] It is unclear from the record whether this document was filed.

[10] NIGC Bulletin No. 93-3, entitled "Submission of Gaming-Related Contracts and Agreements for Review," reads in pertinent part: "The NIGC has received several requests for guidance on whether particular gaming-related agreements require the approval of the NIGC or the Bureau of Indian Affairs (BIA). [¶] Certain gaming-related agreements require the approval of either the National Indian Gaming Commission (NIGC) pursuant to 25 U.S.C. § 2711 (25 CFR Part 533) or the Bureau of Indian Affairs pursuant to 25 U.S.C. § 81. [¶] In order to provide timely and uniform advice to tribes and their contractors, *the NIGC and the BIA have determined that certain gaming-related*

determine if the Tribe's views are correct." The Tribe's counsel sent a supplemental letter to Coleman on April 24, 2007, expanding its legal arguments and asking the NIGC to advise the Tribe on the legality of the agreements. Neither Sharp Image nor its counsel was copied on either letter.

On June 14, 2007, the NIGC Acting General Counsel issued an advisory opinion letter (the Opinion Letter) advising the Tribe that the GMA and ELA were both management contracts pursuant to section 2711 of title 25 of the United States Code and void in the absence of approval by the NIGC's chairman. Counsel for Sharp Image was copied on this letter.

The Opinion Letter cited NIGC Bulletin No. 94-5,[11] an informal advisory opinion which provides a definition of "management" relative to management agreements.

---

*agreements, such as consulting agreements or leases or sales of gaming equipment, should be submitted to the NIGC for review. In addition, if a tribe or contractor is uncertain whether a gaming-related agreement requires the approval of either the NIGC or the BIA, they should submit those agreements to the NIGC.* [¶] The NIGC will review each such submission and determine whether the agreement requires the approval of the NIGC. If it does, the NIGC will notify the tribe to formally submit the agreement. [¶] If the NIGC determines that the agreement does not require the approval of the NIGC, the submitter will be notified of that fact and the NIGC will forward the agreement to the BIA for its review. [¶] For additional information, contact Michael Cox at the NIGC . . . or the BIA Gaming Management Office . . . ." (NIGC Bulletin No. 93-3 (July 1, 1993) at <https://www.nigc.gov/compliance/detail/submission-of-gaming-related-contracts-and-agreements-for-review> [as of Sept. 13, 2017], italics added (Bulletin No. 93-3).) (See *New Gaming Systems v. National Indian Gaming Com'n* (W.D.Okla. 2012) 896 F.Supp.2d 1093, 1096, fn. 4 (*New Gaming*).)

[11] The purpose of NGIC Bulletin No. 94-5 is stated therein: "Questions have been raised as to what distinguishes a management contract from a consulting agreement. The answers to these questions depend upon the specific facts of each case. The Commission stands ready to make a decision as to whether or not a particular contract or agreement is a 'management contract' under Commission regulations. However, before doing so, the Commission must see the entire document including any collateral agreements and referenced instruments." (NIGC Bulletin No. 94-5 (Oct. 14, 1994) at <https://www.nigc.gov/compliance/detail/approved-management-contracts-v.-consulting-agreements-unapproved-managemen> [as of Sept. 13, 2017] (Bulletin No. 94-5).) The

16

According to the bulletin, "[m]anagement encompasses many activities (e.g., planning, organizing, directing, coordinating, and controlling.) The performance of any one of such activities with respect to all or part of a gaming operation constitutes management for the purpose of determining whether any contract or agreement for the performance of such activities is a management contract that requires approval." (Bulletin No. 94-5, *supra*.) The Opinion Letter observed that the GMA and ELA gave Sharp Image exclusive control over the gaming equipment to be installed at the casino and a high rate of compensation, both factors that are "indicative of a management agreement."

Regarding the GMA, the Opinion Letter noted that it provides that Sharp Image would maintain the responsibility for promotions and provides direction to the casino general manager. The letter opined, "This alone is sufficient to find management."

Regarding the ELA, the Opinion Letter specifically cited several provisions related to the "control" Sharp Image would have over the gaming operations: the term of the lease is for five years; Sharp Image has the exclusive right to lease to the Tribe additional gaming devices to be used at any of the Tribes existing or future facilities; the Tribe is required to pay 30 percent of the net gaming revenues defined as gross gaming revenues from all gaming activities less prizes, jackpots, and payouts; Sharp Image has the right to inspect and copy casino books and records; remedies for default are only available to Sharp Image, not the Tribe; and the Tribe may purchase the machines Sharp Image provided at the end of the five-year term, but if it does not, the agreement is automatically extended two years.

As for the payment terms in the GMA and ELA, the Opinion Letter stated that those terms violated IGRA, opining that "[t]he agreements show that [Sharp Image] seeks to use the Tribe's gaming facilities as a long term venue where [Sharp Image] is the

---

Bulletin goes on to offer "information and observations" (*ibid.*) about management contracts and other gaming related contracts, some of which we discuss *post*.

17

exclusive supplier of machines and derives a majority of the profit." The Opinion Letter reasoned that if the agreements were enforced, they would give Sharp Image "a fee equaling thirty percent (30%) of adjusted <u>gross</u> revenue because they define 'net revenue' not as IGRA does but rather as all gross revenues received by the Tribe of all machines or table games minus all jackpots or payouts." The Opinion Letter noted that "IGRA defines net revenues as: 'gross revenues of an Indian gaming activity less amounts paid out as, or paid for, prizes <u>and total operating expenses</u>, excluding management fees' " and went on to reason, "As a practical matter, it is possible for thirty percent (30%) of adjusted gross revenue to equal a far higher amount of net revenue because operating costs, such as electricity, building maintenance, and employee salaries, have not been deducted. Consequently, the majority of the benefit of [the] Tribe's gaming would be conveyed to [Sharp Image]." Because this definition of "net revenue" exceeds the "net revenue[]" allowed under IGRA (25 U.S.C. § 2711(c)(l)-(2)), the Opinion Letter concluded that Sharp Image would "receiv[e] the majority of the benefit from the operation over a [five] or [seven] year term" of the ELA, and that allowing such payments would necessarily interfere with Tribe's ability to govern its gaming operation. The Opinion Letter thus stated the ELA would violate IGRA's mandate that "[t]ribes, not machine vendors, are supposed to be the primary beneficiaries of Indian gaming. 25 U.S.C. § 2702(2)."

Regarding the exclusive right to provide the gaming machines and software, the Opinion Letter stated that under both agreements, the Tribe is "beholden to [Sharp Image] for all of its machines" and that, under the circumstances here, the agreements provide Sharp Image with "de facto management ability." Under the agreements, if the Tribe desired more machines, it is dependent on Sharp Image to purchase and lease them to the Tribe and there is nothing in the agreements to prohibit Sharp Image from refusing. "Likewise, if the Tribe wishes to change the payout percentages, it can only get new game software from [Sharp Image] who may or may not have it or may or may not

18

choose to get it." Thus, the Opinion Letter noted that Sharp Image "effectively has a veto over the number and kinds of machines the Tribe may offer."

The Opinion Letter further noted that the default provisions in the ELA expressly list events triggering default by the Tribe and Sharp Image's remedies, but set forth no default events that would apply to Sharp Image and no potential remedies for the Tribe. According to the Opinion Letter, "[s]uch one-sided provisions are a further indication of [Sharp Image]'s apparent ability to control the gaming activity. This level of control coupled with the term and compensation provided is indicative of a management agreement."

The Opinion Letter concluded, "After careful review, we have determined that there are sufficient indicia of control to conclude that the Agreements are management agreements that would require the approval of the Chairman. Under IGRA, a management contract is void if it has not been reviewed and approved by the Chairman of the NIGC pursuant to 25 U.S.C. §2711."

**The Tribe's Motion to Dismiss and Bifurcate the Preemption Issue**

Citing the Opinion Letter, the Tribe moved, on July 9, 2007, to dismiss Sharp Image's complaint based the federal doctrine of complete preemption, contending that the GMA and ELA were unapproved management contracts in violation of IGRA.[12] The Tribe also sought to bifurcate the preemption issue. Sharp Image challenged the admissibility of the Opinion Letter, objecting on hearsay grounds as well as asserting the letter was not properly subject to judicial notice because the letter was not an "official act" of the NIGC.

The trial court denied the motion to bifurcate, and it sustained Sharp Image's objection to the NIGC's Opinion Letter, reasoning that the letter did not have a "binding

_____

[12] The Tribe also sought dismissal based on the doctrine of sovereign immunity.

19

effect" and did not appear to be an "official act of the NIGC." The court further reasoned that it appeared the Tribe was seeking to introduce the Opinion Letter "to prove the truth of the matter asserted therein, that the Acting General Counsel of the NIGC was of the opinion that two of the contracts that are part of the subject litigation violate IGRA."

### NIGC Chairman's Formal Review

After the trial court's ruling, on January 24, 2008, the Tribe asked the NIGC for a formal review of the agreements and to make a "final determination" on the status of the GMA and ELA under federal law. Tribal Chairman Nicholas Fonseca sought a meeting with the NIGC Chairman, which Sharp Image was not privy to. Fonseca testified that the purpose of the meeting was to see if he could "get the NIGC to make some sort of decision" on the legality of the agreements. Fonseca testified that he told Chairman Philip Hogen that he believed that the ELA was "illegal" and asked the NIGC to "please do something about it."

On July 18, 2008, the NIGC advised both parties that it would undertake a formal review of the agreements and would "give Sharp [Image] an opportunity to share [its] views on this subject." Both parties were given an opportunity to provide written submissions to the NIGC, and both did so.

On August 1, 2008, Sharp Image provided its initial written submission. Much of Sharp Image's submission argued that NIGC was acting beyond its legal authority because the agreements are not management contracts and the Tribe did not submit them for approval as management contracts.[13] Sharp Image further complained about the

---

[13] Contrary to Sharp Image's argument, the NIGC "has broad power to determine what does and does not require approval." (*Saint, supra*, 451 F.3d at pp. 50-51 [rejecting a tribe's argument that IGRA and its implementing regulations provide no mechanism for the NIGC to render decisions concerning unapproved contracts and holding that before a tribe can seek a declaration in federal court that a contract is void because it has not been approved by the NIGC, the tribe must first exhaust administrative remedies by submitting the contract to the NIGC].)

Tribe's numerous ex parte communications with NIGC. As for the nature of the agreements, Sharp Image simply asserted they are not management contracts and whether they are is a disputed issue in the state litigation and "may properly be decided in that forum." Sharp Image offered no analysis or argument supporting its assertion that the contracts are not management contracts; nor did it offer any rebuttal to the analysis in the Opinion Letter or the guidance in Bulletin No. 94-5.

Thereafter, Sharp Image made numerous other procedural related submissions up until December 11, 2008, when, according to the Chairman, it submitted a letter repeating the arguments it had made in it August 1, 2008, letter.[14] The Chairman kept the record open for additional submissions through the end of discovery in the instant litigation and all the way up to the day he issued his decision. Sharp Image submitted no additional arguments.

On April 23, 2009, the Chairman issued a 15-page decision letter (Decision Letter) determining that both the GMA and ELA were management contracts. The Chairman characterized the Decision Letter as a "formal determination under 25 U.S.C. § 2711." While acknowledging the statement in the ELA that the parties did not intend to enter a management contract, the Chairman observed that "[d]espite what it calls itself, the 1997 ELA is a management contract." In addition to his determination about the management nature of the agreements, the Chairman disapproved each agreement because they "fail[ed] to include certain statutory provisions required for management contracts," rendering them "void."

As did the Opinion Letter, the Decision Letter advised that "under the 1996 GMA, Sharp [Image] has responsibility for casino promotions and provides direction to the casino's general manager. . . . This directing, coordinating, and controlling alone makes

---

[14] The December 11, 2008, letter is not part of the record on appeal.

21

the 1996 GMA a management contract under IGRA." Additionally, the Decision Letter stated, "[B]oth agreements provide Sharp [Image] with broad operational control sufficient to make them management contracts. In short, Sharp [Image] will have the exclusive right to provide gaming machines for all of the casino floor space at such facilities for five, and potentially seven, years. Freedom to configure the gaming floor, the essence of managing a casino, is not in the control of [the Tribe]. This too is sufficient to make both agreements management contracts. I therefore adopt the management analysis in the 2007 OGC opinion. The 1996 GMA and 1997 ELA are management contracts within the meaning of IGRA, 25 U.S.C. § 2711, and, as such, must be reviewed and approved by the NIGC Chairman."

The Decision Letter also advised that any challenge to the NIGC's formal determination is "subject to appeal to the full Commission" pursuant to former "25 C.F.R. Part 539" and thereafter to "a federal district court" pursuant to "25 U.S.C. § 2714." Sharp Image appealed the Chairman's decision to the full commission. However, on June 5, 2009, the Chairman advised Sharp Image by letter that because the vice commissioner had recused himself from all matters related to the Tribe and the Commission as constituted at that time consisted of only the vice commissioner and the Chairman, the Commission was "functionally unable to review and decide your appeal."[15] The letter further advised, "Your appeal is governed by [former] 25 C.F.R § 539.2, which provides that, '[i]n the absence of a decision within [thirty days after receipt of the appeal], the Chairman's decision shall constitute the final decision of the

---

[15] The full Commission consists of three full-time members. Two members are necessary for a quorum. (25 U.S.C. § 2704(b)(1), (d).) The chairman is appointed by the President with the advice and consent of the Senate and the other two commissioners are appointed by the Secretary of the Interior. (25 U.S.C. § 2704(b)(1)(A), (B); *Tamiami Partners v. Miccosukee Tribe of Indians* (11th Cir. 1995) 63 F.3d 1030, 1033 (*Tamiami Partners*).)

22

Commission.' "  The letter concluded, "Because no appeal decision will issue, the Chairman's decision will become the final decision of the Commission on June 20, 2009. Final Commission decisions may be appealed to the appropriate Federal district court pursuant to 25 U.S.C. § 2714."[16]  Sharp Image never filed such an appeal.

### The Tribe's Motion to Quash/Dismiss

On July 9, 2007, the Tribe filed a motion to quash/dismiss for lack of subject matter jurisdiction, contending that the trial court lacked jurisdiction to hear Sharp Image's contractual claims because the claims were completely preempted by IGRA.  On April 17, 2009, the Tribe filed an amended motion to dismiss for lack of subject matter jurisdiction on the ground of preemption.  The Tribe argued that Sharp Image's claims were completely preempted because (1) if enforced, they would give Sharp Image a proprietary interest in the Tribe's gaming operation in violation of IGRA, and (2) the

---

[16]  Former part 539.2 of 25 Code of Federal Regulations provided:  "A party may appeal the Chairman's disapproval of a management contract or modification under parts 533 or 535 of this chapter to the Commission.  Such an appeal shall be filed with the Commission within thirty (30) days after the Chairman serves his or her determination pursuant to part 519 of this chapter.  Failure to file an appeal within the time provided by this section shall result in a waiver of the opportunity for an appeal.  An appeal under this section shall specify the reasons why the person believes the Chairman's determination to be erroneous, and shall include supporting documentation, if any.  Within thirty (30) days after receipt of the appeal, the Commission shall render a decision unless the appellant elects to provide the Commission additional time, not to exceed an additional thirty (30) days, to render a decision.  *In the absence of a decision within the time provided, the Chairman's decision shall constitute the final decision of the Commission.*"  (Italics added.)  This provision was later replaced with two regulations.  Part 583.6 of 25 Code of Federal Regulations, effective October 25, 2012, provides that the Commission "*shall* issue its final decision within 90 days after service of the appeal brief or within 90 days after the conclusion of briefing by the parties, whichever is later."  (25 C.F.R § 583.6(a), italics added.)  Part 580.11 of the 25 Code of Federal Regulations, effective on the same date, provides in pertinent part:  "In the absence of a decision of a majority of the Commission within the time provided, the Chair's decision shall constitute the final decision of the Commission."

agreements were unapproved management contracts conferring managerial control to Sharp Image without prior approval by the NIGC in violation of IGRA.

On November 17, 2009, the trial court denied the Tribe's motions. The court reasoned that, because the GMA and ELA were "terminated and/or cancelled" by the Tribe, the NIGC lacked jurisdiction to take any action on them. The court stated, "Since the contract was not viable and had been terminated or cancelled according to the parties, it obviously was not a contract which dealt with gaming." Thus, since the agreements were terminated or cancelled, there was "no jurisdiction in the [NIGC] . . . to review, regulate, approve or disapprove them. Absent such regulatory authority in the NIGC, the dispute regarding damages from any alleged breach . . . rests with the State of California courts."

As "a separate and independent basis for determining the character of the action of the Chairman," the trial court reasoned that the Chairman's decision "was not a final action and must be disregarded because it was fatally flawed." The court found that the Chairman's action violated Sharp Image's due process rights and contravened various IGRA procedural requirements. The court further found that the Tribe's request to NIGC was not a request for approval of a management contract, rather it was a "request for an expression of opinion . . . . As such it is, in the Court's opinion, *not entitled to any deference*." (Italics added.)

The trial court did not determine, as a matter of law, whether the GMA and ELA were management contracts or whether the Note was a collateral agreement to a management contract.

**Motion for Discovery Sanctions**

While the litigation was pending, the Tribe discovered that Sharp Image failed to produce documents during discovery concerning Sharp Image's interactions with the California Bureau of Gambling Control (the Bureau), referencing its business dealings with the Tribe. The documents included an investigative report prepared by the Bureau,

24

dated November 19, 2008 (Bureau Report), which specifically referenced Sharp Image's instant lawsuit against the Tribe. The Bureau concluded in a letter dated January 26, 2009, that Sharp Image was not "suitable to conduct business within the California gaming environment," in part due to its business dealings with the Tribe.

After discovering this information, the Tribe sought sanctions against Sharp Image commensurate with the withholding of this evidence. Because the Bureau's finding of unsuitability meant that the Tribe could not accept gaming machines from Sharp Image effective November 19, 2008, about a month before Red Hawk Casino opened, the Tribe sought an issue sanction establishing that fact and prohibiting Sharp Image from rebutting the withheld evidence. The trial court denied the Tribe's motion for issue sanctions.

**Motion for Summary Judgment**

The Tribe moved for summary judgment on various grounds, including the following: (1) the lawsuit was time barred because Sharp Image's 2007 complaint was premised on an actual breach of its claimed right to exclusivity, which allegedly occurred in 1999; (2) alternatively, if the statute of limitations had not run, the Tribe was nevertheless entitled to summary judgment because Sharp Image could not prove its claims under the law governing anticipatory breach; and (3) under any theory of its complaint, the Tribe was not the "but for" cause of any alleged damages because under the Tribe's Compact with the State, the Tribe could not accept gaming machines from Sharp Image in December 2008, when Red Hawk Casino opened. The trial court denied the Tribe's motion for summary judgment.

**The Trial**

After Sharp Image dismissed all causes of action except the breach of contract claims related to the ELA and the Note, the case proceeded to jury trial on those claims. The jury determined that the Tribe had breached both contracts and returned a verdict in favor of Sharp Image of approximately $20.4 million on the ELA and approximately $10

million on the Note.[17]  The Tribe then moved for judgment notwithstanding the verdict, which the trial court denied.  The court found there was substantial evidence to support the verdict "that the ELA and promissory note agreements were formed and that the agreements also covered any future gaming facility or facilities of [the Tribe]."

## DISCUSSION

### I. Arguments on Appeal

On appeal, the Tribe argues that IGRA completely preempts Sharp Image's contractual claims and the superior court lacked subject matter jurisdiction as a result. The Tribe contends that the NIGC issued a final agency determination that Sharp Image's contracts violated IGRA and were invalid management contracts and that we should defer to this determination.  Thus, the Tribe argues, "[b]ecause the NIGC has determined the

---

[17]  The trial court did not, as Sharp Image claims, instruct the jury to determine whether the ELA and the Note were management contracts.  Rather, as a defense to Sharp Image's breach of implied covenant of good faith claim, the Tribe presented evidence that it had repudiated the ELA and the Note based on the good faith belief that the agreements were void under IGRA.  At the Tribe's request, the trial court instructed the jury on the definition of the term "management contract" and advised the jury that unapproved management contracts are void.  The instruction read as follows:  "A management contract is any contract between an Indian tribe and a contractor that provides for any management activity with respect to all or part of a gaming operation. Management encompasses activities such as planning, organizing, directing, coordinating and controlling.  [¶]  When multiple agreements, read together, provide for management of an Indian gaming operation, each of the agreements requires federal approval. Management contracts that have not been approved by the [NIGC] Chairman are void." The instruction did not explain that "[t]he performance of *any one of such activities* with respect to all or part of a gaming operation constitutes management" as set forth in Bulletin No. 94-5, which we discuss in more detail, *post*.  (Italics added.)  Nor did the instructions list the specific "activities" set forth in the bulletin that are suggestive of management contract, which we also discuss *post*.  In any event, contrary to Sharp Image's contention about what the jury was asked to decide, the verdict forms asked the jury to make a number of specific findings, but not whether the ELA is a management contract or whether the Note is a collateral agreement to a management contract. Moreover, as we discuss *post*, these were questions of law for the trial court.

26

agreements fall within 'IGRA's protective structure,' [Sharp Image]'s claims predicated upon the agreements are preempted." Sharp Image responds that the trial court correctly declined to defer to the NIGC Decision Letter because it does not constitute a final agency action and the Tribe failed to carry its burden of establishing preemption.

Amicus United States provided extensive argument on preemption. First, amicus contends that the trial court erred in rejecting the Tribe's preemption argument before first determining whether the agreements were management contracts or collateral agreements of management contracts under IGRA. If the agreements are unapproved management contracts or unapproved collateral agreements of management contracts, then Sharp Image's claims are preempted by IGRA, amicus argues. Additionally, amicus contends that the trial court erred in failing to defer to the NIGC's regulatory interpretation that the GMA and ELA were management contracts under IGRA. Finally, amicus contends that while the NIGC did not expressly address whether the Note is a management contract, it is nevertheless a collateral agreement to the ELA for IGRA purposes.

The Tribe filed a response to the amicus brief, agreeing with its analysis and additionally arguing that that the trial court erred in assuming jurisdiction to reach the merits of Sharp Image's arguments on the NIGC's alleged procedural violations without first establishing its jurisdiction. Sharp Image responds that the trial court was not required to make a determination about whether the agreements were management contracts under IGRA before assuming jurisdiction. It argues that under *American Vantage, supra*, 103 Cal.App.4th 590, "an Indian tribe's contention that a contract was an unapproved management contract and therefore unlawful and void is an affirmative defense to be ascertained and adjudicated in the ordinary course of trial proceedings" rather than as a jurisdictional question. Additionally, Sharp Image relies upon the *American Vantage* court's suggestion that whether a contract is found to be a consulting agreement or a void management agreement, either characterization leads to the same

27

result; the contract is not subject to IGRA regulation. Sharp Image further contends that the trial court was not required to defer to the NIGC's 2007 and 2009 letters opining that the ELA was an unapproved management contract and therefore void. Finally, concerning the nature of the agreements, Sharp Image argues that ELA is only a lease for gaming equipment and is not a management contract and even if the ELA is a management contract, the Note is not a collateral agreement subject to IGRA because it does not "provide for some aspect of management."

For the reasons we shall discuss, we hold that the trial court was obligated to determine whether the agreements were management contracts or collateral agreements to management contracts under IGRA, a necessary determination related to the question of whether Sharp Image's action was preempted by IGRA. We further hold that the ELA is a management contract and that the Note is a collateral agreement to a management contract. Thus, these agreements are within the protective scope of IGRA. Because these agreements were not approved by the NIGC Chairman as required by IGRA and are consequently void under federal law, Sharp Image's action is preempted by IGRA and thus, the trial court did not have subject matter jurisdiction.

## II. Analysis

## A. Preemption and IGRA

In general, a plaintiff can avoid federal subject matter jurisdiction by pleading claims relying exclusively on state law, such as contractual claims. (*Caterpillar Inc. v. Williams* (1987) 482 U.S. 386, 392 [96 L.Ed.2d 318, 327].) The presence or absence of federal question jurisdiction is governed by the well-pleaded complaint rule: federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. (*Ibid.*) However, certain federal statutory schemes " 'convert[] an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " (*Id.* at p. 393.) There are four different types of preemption that have been recognized by our Supreme Court: (1) express

28

preemption, which occurs when Congress defines the extent to which a federal law preempts state law; (2) conflict preemption, which occurs when it is impossible to comply with both state and federal laws; (3) obstacle preemption, which arises when a state law creates an obstacle to the full execution of an objective of federal law; and (4) field preemption, which "applies 'where the scheme of federal regulation is sufficiently comprehensive to make [a] reasonable . . . inference that Congress "left no room" for supplementary state regulation.' [Citation.] [¶] ' "[C]ourts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' " (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) Under the field preemption doctrine, which applies here, any claim purportedly based on the preempted state law is considered, from its inception, to be a federal claim and therefore arises under federal law for subject matter jurisdiction purposes. (*Caterpillar*, at p. 393.) Whether and to what extent IGRA preempts state contract-enforcement actions is a question of law and is reviewed de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 (*Farm Raised Salmon*) ["federal preemption presents a pure question of law"]; *Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371 [federal "[p]reemption is a legal issue involving statutory construction and the ascertainment of legislative intent"].)

"One of IGRA's principal purposes is to ensure that the tribes *retain control* of gaming facilities set up under the protection of IGRA and of the revenue from these facilities." (*Wells Fargo, supra*, 658 F.3d at p. 700, italics added; *id.* at p. 687 [requiring tribes to be the "primary beneficiary" of gaming].) "The regulatory scope of IGRA is . . . far reaching in its supervisory power over Indian gaming contracts." (*Gaming World Int., Ltd. v. White Earth Chippewa Indians* (8th Cir. 2003) 317 F.3d 840, 848.) IGRA so dominates the field of regulating Indian gaming that it not only completely preempts the field of Indian gaming but is also incorporated into gaming contracts by operation of law. (*Ibid.*) Indeed, the legislative history is quite clear on Congress's intent to occupy the

29

field. "The Senate Report unequivocally states . . . that IGRA 'is intended to expressly preempt the field in the governance of gaming activities on Indian lands.' " (*Tamiami Partners, supra*, 63 F.3d at p. 1033, citing Sen.Rep. No. 446, 2d Sess. (1988) reprinted in U.S. Code Cong. & Admin. News, p. 3076.) Our own Supreme Court has recognized the intent of Congress to preempt the field. "In the structure and scope of IGRA, which comprehensively addresses all forms of gambling on Indian lands, Congress made clear its intent that IGRA preempt the field of regulation of Indian gambling." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 618 [noting the express intent of Congress set forth in the Senate report to preempt the field of Indian gaming].)

In the context of federal removal jurisdiction, courts have applied the doctrine of complete preemption to IGRA. For example, in *Gaming Corp. of America v. Dorsey & Whitney* (8th Cir. 1996) 88 F.3d 536, 544 (*Gaming Corp.*), the court stated: "Examination of the text and structure of IGRA, its legislative history, and its jurisdictional framework likewise indicates that Congress intended it completely preempt state law." The *Gaming Corp.* court also noted that every reference to court action in IGRA specifies federal court jurisdiction and that state courts are never mentioned in IGRA. (*Id.* at p. 545.) The court went on to hold: "The statute itself and its legislative history show the intent of Congress that IGRA control Indian gaming and that state regulation of gaming take place within the statute's carefully defined structure. We therefore conclude that IGRA has the requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule." (*Id.* at p. 547.)

In *Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, Division Seven of the Second Appellate District also recognized the preemptive effect of IGRA. There, a gaming management company brought various contract-related claims against a tribe. (*Id.* at p. 1411.) The tribe filed a motion to stay

the proceedings, or in the alternative to quash on ground that federal law completely preempted Indian gaming and gaming contract regulation and thereby deprived the state court of jurisdiction to rule on claims alleged in the complaint. (*Id*. at p. 1414.) The trial court found that the allegations in the complaint all concerned Indian gaming, ruled that IGRA preempted the field and dismissed the action. (*Id*. at p. 1424.) The appellate court, following the analysis in *Gaming Corp., supra*, 88 F.3d 536, held that the management company's claims, however styled, were completely preempted by IGRA and affirmed the trial court's dismissal because it lacked jurisdiction. (*Great Western Casinos*, at pp. 1426, 1428.)

In *American Vantage*, our sister court in the Fifth Appellate District noted that application of the doctrine of complete preemption is not limited to the determination of federal removal jurisdiction. (*American Vantage, supra*, 103 Cal.App.4th at p. 595.) "[I]f the complete preemption doctrine applies, the state court does not have jurisdiction over the action" and where the case is not removed from state court to federal court, the state court must dismiss for lack of jurisdiction. (*Ibid*.)

However, federal courts recognize that IGRA's preemptive force is limited to claims that fall within its scope. (See *Gaming Corp., supra*, 88 F.3d at pp. 548-549.) IGRA does *not* apply to all contract disputes between a tribe and a non-tribal entity, but only those pertaining to management contracts and collateral agreements to those contracts, as those terms are defined under IGRA. (See 25 U.S.C. § 2711; 25 C.F.R. §§ 502.5, 502.15; see also *Casino Resource Corp. v. Harrah's Entertainment* (8th Cir. 2001) 243 F.3d 435, 439-440.)

Similar observations were made by the court in *American Vantage*. That court has observed that "[b]ased on its text and structure, legislative history and jurisdictional framework, the IGRA has been construed as having the requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule. [Citation.] Thus, claims that fall within the preemptive scope of

31

the IGRA, i.e., those that concern the regulation of Indian gaming activities, are considered to be federal questions. [¶] *However, not every contract between a tribe and a non-Indian contractor is subject to the IGRA.* [Citations.] *Rather, IGRA regulation of contracts is limited to management contracts and collateral agreements to management contracts.*" (*American Vantage, supra*, 103 Cal.App.4th at p. 596; 25 U.S.C. § 2711, italics added.)

Sharp Image argues that for purposes of preemption, it does not matter whether the agreements are unapproved management contracts under IGRA. Relying on *American Vantage*, Sharp Image contends that where a plaintiff contractor sues to enforce an agreement and a defendant tribe alleges the agreement is a management contract that is void because it was not approved by the NIGC, there can be no IGRA preemption no matter whether the agreement is a management contract or not. We disagree with the point made in *American Vantage* upon which Sharp Image relies. To explain our disagreement, a review of *American Vantage* is required.

To begin with, the agreement ultimately at issue in *American Vantage* was not a management contract and the NIGC said so. In that case, the Table Mountain Rancheria retained American Vantage Companies for the development and operation of a casino and initially entered into various management contracts. (*American Vantage, supra*, 103 Cal.App.4th at p. 593.) As the *American Vantage* court explained, because these earlier agreements were in fact management contracts subject to IGRA, American Vantage was required to obtain NIGC approval under section 2711 of title 25 of the United States Code. (*American Vantage*, at p. 593.) Because the agreements were never approved, the NIGC initiated an enforcement action against American Vantage. The NIGC concluded, "[T]he original management contract improperly delegated gaming authority to [American Vantage]." (*Ibid.*) Thereafter, Table Mountain, American Vantage, and the NIGC reached a settlement agreement providing that American Vantage would pay a fine, the parties would enter an agreement terminating the existing management contract,

and the parties would enter a consulting agreement in lieu of the management contract. (*Ibid.*) The termination agreement, executed contemporaneously with and as part of the settlement agreement, cancelled the existing management contract in exchange for a payment of $16,800,000. (*Ibid.*)

The second contract executed pursuant to the settlement, the consulting agreement, obligated American Advantage to provide technical assistance, training and advice to Table Mountain in the operation of its gaming activities in exchange for a monthly fee. The NIGC reviewed both agreements and determined that they did not require NIGC approval. (*American Vantage, supra*, 103 Cal.App.4th at p. 593.) Significantly, the NIGC expressly determined that the termination and consulting agreements pursuant to the settlement were *not* management contracts or collateral agreements to management contracts subject to its authority under IGRA. (*Id.* at pp. 593-594.)

Several years after executing the termination and consulting agreements, after a change in tribal leadership, Table Mountain notified American Vantage that it was cancelling these agreements and would make no further payments. (*American Vantage, supra*, 103 Cal.App.4th at p. 594.) American Vantage then filed a breach of contract action. (*Ibid.*) Table Mountain moved to quash the complaint on jurisdictional grounds, contending that American Vantage's claims were completely preempted under IGRA because the termination and consulting contracts were purportedly unapproved management contracts. (*Ibid.*) The trial court granted Table Mountain's motion, reasoning that "whether [American Vantage] acted as a manager or not, the contracts themselves related to the governance of Table Mountain's gaming activities" and accordingly, the contractual claims were completely preempted. (*Ibid.*)

On appeal, the *American Vantage* court observed that "the NIGC determined that neither the termination agreement nor the consulting agreement required the approval of the NIGC chairman." (*American Vantage, supra*, 103 Cal.App.4th at p. 596.) Thus, the *American Vantage* court correctly reasoned, "it must be concluded that the contracts fall

33

outside the IGRA's protective structure." (*Ibid.*)  This key fact distinguishes *American Vantage* from the instant case.  In *American Vantage*, the termination and consulting agreements were executed pursuant to a settlement agreement involving the NIGC itself after an NIGC enforcement action pertaining to prior agreements the NIGC had determined were management contracts.  (*Id.* at pp. 593-594.)  As for the termination and consulting agreements, there was nothing for the NIGC to approve, because the NIGC had already determined the agreements were not management contracts within the scope of IGRA.  Thus, the protective purposes of IGRA were not implicated by American Vantage's state claims based on those agreements.  In the instant case, the Tribe and Sharp Image entered agreements that the NIGC never approved and subsequently determined were management contracts.  In other words, the closer analog in the *American Vantage* case to the case before us is not the termination and consulting agreements that were the subject of the litigation on appeal but the earlier unapproved management contracts that led to the NIGC enforcement action in the first place.

Even though the NIGC had essentially determined there was nothing for it to approve by determining that the termination and consulting contracts were not management contracts, the *American Vantage* court went on to address Table Mountain's argument that the consulting agreement was actually an unapproved management contract and thus void.  (*American Vantage, supra*, 103 Cal.App.4th at p. 596.)  The court stated, "At this point it is *unknown whether Table Mountain will be able to prove this defense*.  Such a determination will require an examination of the relationship between the parties.  Once those facts are ascertained in the trial court, they will determine the character of the contract under the IGRA."[18]  (*Ibid.*, italics added.)  The court then said,

---

[18]  At oral argument, Sharp Image contended that whether the agreement here is a void management contract was a question of contract illegality and an affirmative defense that could be determined by the jury if there is a factual dispute.  Sharp Image cited the above

34

"there are only two possible outcomes[:]  The contract will be found to be either a consulting agreement or a void management agreement.  Nevertheless, either characterization leads to the same result.  The *contract is not subject to IGRA regulation*."  (*Ibid.*, italics added, citing *Gallegos v. San Juan Pueblo Business Dev. Bd. Inc.* (D.N.M. 1997) 955 F.Supp. 1348, 1350 (*Gallegos*).)  It is this portion of the *American Vantage* discussion upon which Sharp Image extensively relies in its argument on appeal.  And it is this point in *American Vantage* with which we disagree.

Our disagreement begins with the case the *American Vantage* court cited for this proposition, *Gallegos, supra*, 955 F.Supp. 1348.  That case is also distinguishable and the reasoning flawed.  In *Gallegos*, a gaming company sued a tribe in New Mexico state

---

discussion in *American Vantage* in support of this procedure.  Additionally, in its response to the amicus brief, Sharp Image cited Civil Code section 1667, subdivision (1), which provides that a contract is not lawful if it is "[c]ontrary to an express provision of law" and Civil Code section 1598, which provides, "Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void."  However, citing *Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 349-350, Sharp Image conceded in its written response to the amicus brief that whether a contract is illegal or contrary to public policy is a question of law to be determined from the circumstances of each particular case, and it further suggested that the trial court would have been obligated to decide this issue first if its determination was "essential to the court's subject matter jurisdiction."  Moreover, we note that all but one of the several cases Sharp Image cites do not involve federal preemption and none involve questions of subject matter jurisdiction.  The one case that references federal law, *Duffens v. Valenti* (2008) 161 Cal.App.4th 434, involves a motion to compel arbitration, provisions of the Federal Arbitration Act (FAA) and a belated contention on appeal that the FAA applied. In *Duffens*, the illegality of the contract was asserted as a defense to arbitrability, a matter the court said was a question of law to be decided by the trial court.  (*Duffens*, at p. 444.) As for the applicability of the FAA, the court rejected that contention, in part because of language in the contract making the choice of law California law.  It applied the rule that generally, procedural state rules are not preempted by the FAA if the parties have agreed to arbitrate under California law.  (*Id*. at p. 452.)  As we have said, preemption involves a question of law for the trial court and as we make clear *post*, the instant case should never have gone to the jury because the action was preempted by IGRA, and thus the trial court lacked subject matter jurisdiction.

court to recover gaming equipment after the tribe repudiated an equipment lease agreement the NIGC had concluded was an unapproved management contract. (*Gallegos*, at p. 1349.) The tribe removed the case to federal court, alleging federal question jurisdiction because the action was based on an unapproved management contract. (*Ibid*.) Thus, according to the tribe, the state law claim was preempted. The gaming company moved to remand the case back to the state court. (*Id*. at p. 1348.) The district court granted that motion, holding that whether the contract was a lease or an unapproved management contract did not affect the action; however, the court reached this conclusion, in part, because the action was for a writ of replevin to return the equipment based on breach of the agreement. (*Id.* at pp. 1349-1350.) In our view, this was the correct result because the primary purpose of a replevin action in New Mexico "is to give or restore the actual possession of goods and chattels to the person lawfully entitled" (*Wood v. Grau* (1951) 55 N.M. 429, 433), and where the plaintiff is simply seeking the return of his property, the protective scope of IGRA is not implicated.

While the *American Vantage* court cited *Gallegos* for the proposition that unapproved management contracts are not subject to IGRA regulation, it did not reference what the district court in *Gallegos* actually said on this point. (*American Vantage, supra*, 103 Cal.App.4th at p. 596.) The district court reasoned that an unapproved management contract is "only an *attempt* at forming a management contract"; as such the plaintiff's "suit in no way interferes with the regulation of a management contract because none ever existed. . . . It is quite a stretch to say that Congress intended to preempt state law when there is no valid management contract for a federal court to interpret." (*Gallegos*, *supra*, 955 F.Supp. at p. 1350, fn. omitted.) But this seemingly unnecessary discussion is flawed and thus, so too is the discussion in *American Vantage*.

First, that a management contract is not approved by the NIGC does not mean the agreement is not a management contract. It is a void management contract, but it is

36

nevertheless still a management contract within the meaning of IGRA given the rights and obligations set forth therein. Second, the district court's reasoning in *Gallegos* is contrary to the clear purpose of IGRA. If state actions against tribes can go forward to enforce agreements that are management contracts by virtue of the rights and obligations created therein even though those agreements have not been approved, IGRA will be circumvented and tribes will lose the protections Congress intended IGRA to provide. As we have noted, "[o]ne of IGRA's principle purposes is to ensure that the tribes *retain control* of gaming facilities set up under the protection of IGRA and of the revenue from these facilities." (*Wells Fargo, supra*, 658 F.3d at p. 700, italics added.) And the "pre-screening" of contracts between tribes and non-tribal entities that might impair this "fundamental purpose of the federal statutory scheme . . . constitutes the core of Congress's protection for Indian gaming establishments." (*Ibid.*) Thus, to permit the enforcement of agreements that are management contracts within the meaning of IGRA that have not been prescreened and approved by the NIGC would defeat the purposes of IGRA and undermine Congress's protective scheme. Third, the district court's reasoning in *Gallegos* is inconsistent with enforcement authority granted NIGC. The Chairman may order temporary closure of gaming operations conducted pursuant to an unapproved management contract and the NIGC may order permanent closure. (25 U.S.C. § 2713(b)(1), (2); 25 C.F.R. § 573.4(a)(7).) Thus, the notion that the agreement is a mere "*attempt* at forming a management contract" because it has not been approved (*Gallegos, supra*, 955 F.Supp. at p. 1350), does not mean the agreement somehow is outside the protective scope of IGRA.

The *American Vantage* court also missed this point, and indeed its statement that an unapproved management contract is "not subject to IGRA regulation" is inconsistent with its earlier observation concerning NIGC's regulatory authority. Earlier in the opinion, the court stated, "When, based on an examination of the relationship of the parties and the IGRA, the NIGC finds de facto management *under an unapproved*

37

*agreement*, it has the authority to institute an enforcement action." (*American Vantage, supra*, 103 Cal.App.4th at p. 596, italics added.) In our view, the *American Vantage* court's recognition of NIGC's enforcement authority concerning unapproved management contracts cannot be squared with the notion that an unapproved management contract is not subject to IGRA regulation. Indeed, it would be quite incongruous to allow a state court contractual claim related to a gaming facility the NIGC shut down because the agreement underlying the litigation had not been approved by NIGC as was therefore void.

Despite the pronouncement that an unapproved management contract is not subject to IGRA regulation, the court in *American Vantage* still saw the possibility of IGRA preemption. Relying on *Gaming Corp., supra*, 88 F.3d 536, the court in *American Vantage* wrote: "Potentially valid state claims are those that would not interfere with [the tribe]'s governance of gaming. [Citation.] Thus, to be preempted, the claim must do more than *involve* Indian gaming activities. The claim must intrude on the tribe's *control* of its gaming enterprise. Accordingly, appellant's claims must be analyzed in this context." (*American Vantage, supra*, 103 Cal.App.4th at p. 597.) But the *American Vantage* court did not consider the actual context in which the *Gaming Corp.* court reasoned that the claim must intrude on the tribe's *control* of its gaming enterprise before the claim could be preempted.

*Gaming Corp.* did not involve a contractual dispute over an agreement like the dispute in the instant case. Nor was an Indian tribe a party in that litigation on appeal. In *Gaming Corp.*, the lawsuit related to claims made by Gaming Corp. and another casino management company against an attorney, Dorsey, for violation of federal and state law while representing a tribe during a tribal casino management licensing process. Dorsey removed the case to federal district court, but the court remanded the case back to the state court after dismissing several causes of action and concluding no federal questions remained. (*Gaming Corp., supra*, 88 F.3d at p. 539.) Dorsey appealed the remand.

38

The factual backdrop in *Dorsey* was unusual. Prior to the litigation, Dorsey had represented Gaming Corp., but then accepted representation of the tribe after obtaining the consent of Gaming Corp. and the other management company. (*Gaming Corp., supra*, 88 F.3d at p. 539.) Thereafter, Dorsey represented the tribal gaming commission in assessing applications the two management companies made for a permanent license to manage one of the tribe's casinos. Dorsey presented evidence during several commission hearings, and the commission ultimately denied the applications. (*Id*. at p. 540.) The management companies sued Dorsey in state court, alleging various common law violations in which they essentially asserted that Dorsey made the companies appear unsuitable during the commission hearings. (*Ibid*.) They also alleged Dorsey violated a fiduciary duty to Gaming Corp. (*Ibid*.)

As we have noted, the *Gaming Corp*. court held that IGRA completely preempts state law. (*Gaming Corp., supra*, 88 F.3d at pp. 544, 547.) The court went on to reason that a claim is preempted if it "interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." (*Id*. at p. 548.) The court noted that the line of cases upon which this rule was based "demonstrates a continuing federal concern for tribal economic development, self-sufficiency, and self-government which Congress reaffirmed in the text of IGRA." (*Ibid.*) It was in this context—a case involving a dispute between "non-Indian" parties—that the *Gaming Corp.* court reasoned the key question was whether any of the claims would "interfere with tribal governance." (*Id*. at p. 549.) The court ultimately reasoned that, because the tribal licensing process is required and regulated by IGRA, "[a]ny claim which would directly affect or interfere with a tribe's ability to conduct its own licensing process . . . fall[s] within the scope of complete preemption." (*Ibid.*, fn. omitted.) The court observed that tribes need to be able to hire agents, including attorneys, to assist them, and Dorsey was hired to carry out the tribe's licensing responsibilities. (*Id*. at pp. 549-550.) It was in the context of determining

39

whether any claims related to Dorsey's duty to the management companies were preempted, that the court said, "Potentially valid claims under state law are those which would not interfere with the [tribe]'s governance of gaming." (*Id*. at p. 550.) However, any claims related to Dorsey's duty to the tribe during the licensing process were preempted. (*Ibid*.)

In our view, in citing the *Gaming Corp*. court's language that "[p]otentially valid claims under state law are those which would not interfere with the [tribe]'s governance," (*Gaming Corp., supra*, 88 F.3d at p. 550) the *American Vantage* court did not consider the nature of management contracts. Indeed, in lifting the language from *Gaming Corp*. and applying it to the case before it, the *American Vantage* court emphasized that the plaintiff's claims were based on contracts the NIGC had determined did not require approval. (*American Vantage, supra*, 103 Cal.App.4th at p. 597.) But it then reasoned that since American Vantage was not seeking to have the contract reinstated, but rather was seeking monetary damages only, the claim against Table Mountain did not undermine the tribe's decision to terminate the agreement or diminish the tribe's control over its gaming operations. (*Ibid*.)

However, unlike the termination and consulting contracts in *American Vantage*, management contracts, by their nature, impact a tribe's control of its gaming enterprise. That is why they must be preapproved. And as we discuss *post*, the control given to Sharp Image over the Tribe's gaming operations here is what makes the ELA a management contract. Furthermore, the threat of a state court lawsuit and judgment grounded on a breach of an unapproved and void management contract gives the contractor leverage over the tribe and in that way, impacts the tribe's control of its gaming operations. Moreover, a judgment on a void contract requiring the payment of money damages, would necessarily interfere with Tribe's ability to govern its gaming operation to the extent it could not use the monies necessary to pay the judgment for its operation. As a consequence, IGRA's goals of ensuring that tribes are the primary

40

beneficiary of gaming operations and advancing tribal economic development would be undermined. (See 25 U.S.C. § 2702(1)-(2).)[19] Thus, even if we were to apply an *interference with control* test as suggested in *American Vantage*, we would conclude Sharp Image's action is preempted by IGRA.

However, our approach is much more straight forward. We conclude that a state court claim cannot go forward based on an agreement that is an unapproved management contract or an unapproved collateral agreement to a management contract under IGRA. Such actions are preempted by IGRA. Accordingly, the threshold question that must be answered is whether the agreements underlying this litigation are management contracts or collateral agreements to management contracts, bringing them within IGRA's protective scope. If not, Sharp Image's action was not preempted. If so and the agreements were not approved, Sharp Image's action to enforce the agreements is preempted by IGRA and the trial court did not have subject matter jurisdiction. As we next discuss, the trial court erred when it failed to answer this legal question critical to the preemption determination and its subject matter jurisdiction.

### B.  The Trial Court's Failure to Determine the Status of Agreements

When questions of preemption are raised, "state courts retain jurisdiction" to resolve the preemption question and determine their own subject matter jurisdiction. (*Mack v. Kuckenmeister* (9th Cir. 2010) 619 F.3d 1010, 1021; see also *People v. Zarazua*

---

[19]  In *American Vantage*, Table Mountain argued that money damages would adversely impact its operations of its only economic asset. The *American Vantage* court dismissed this argument as conflating "control" with "profitability." According to the court, while money damages might decrease Table Mountain's net profits, "Table Mountain's ability to autonomously govern its gaming operation would remain intact." (*American Vantage, supra*, 103 Cal.App.4th at pp. 597-598.) But this reasoning overlooks the leverage a management contractor would have over a tribe during the pendency of an unapproved management contract stemming from the threat of litigation and the impact on the tribe's control of its operations. It also overlooks the protective purposes of IGRA.

(2009) 179 Cal.App.4th 1054, 1062 [" 'a court has jurisdiction to determine its own jurisdiction' "]; 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 339, p. 963.) When the trial court here ruled on the question of preemption, it failed to determine whether the agreements were subject to IGRA, a pure question of law. (*Farm Raised Salmon, supra*, 42 Cal.4th at p. 1089, fn. 10 [preemption is a pure question of law]; *Wells Fargo, supra*, 658 F.3d at p. 694 [resolution of the question whether an agreement is a management contract is "fundamentally" a legal question of statutory interpretation]; *New Gaming, supra*, 896 F.Supp.2d at p. 1102 ["Determining whether the Agreement is a management contract for the operation of a gaming facility within the meaning of IGRA is a matter of statutory interpretation"].) The question of whether the agreements are subject to IGRA requires an analysis involving contractual interpretation and statutory/regulatory interpretation. (See *State Farm Fire & Casualty Co. v. Lewis* (1987) 191 Cal.App.3d 960, 963 [contractual interpretation is a question of law]; (*Dean W. Knight & Sons, Inc. v. State of California ex rel. Dept. of Transportation* (1984) 155 Cal.App.3d 300, 305 (*Dean W. Knight & Sons*) ["construction of a statute and the question of whether it is applicable present solely questions of law"]; *Wells Fargo*, at pp. 694-699 [concluding that the bond indenture at issue was a management contract under IGRA based on an analysis involving statutory and regulatory interpretation, identification and interpretation of relevant terms of the bond indenture, and application of the statutory and regulatory rules as interpreted].) Thus, the trial court's failure to determine whether the agreements at issue were subject to IGRA was error since the question of whether an agreement is a management contract or a collateral agreement to a management contract is a foundational question of law critical to the preemption/subject matter jurisdiction issue the trial court needed to resolve.

The trial court avoided ruling on the management contract issue in its ruling on preemption by reasoning that because the Tribe repudiated the agreements, there were no agreements for the NIGC to approve or disapprove. The court reasoned, "Since the

42

[Tribe] asserts the GMA[], ELA and Note herein are terminated and/or cancelled, there is no jurisdiction in the NIGC with regard to said instruments, either to review, regulate, approve or disapprove them." This reasoning puts the cart before the horse. An unapproved management contract is void *ab initio* because it is not approved by the NIGC, regardless of whether it is subsequently repudiated. Indeed, the tribe expressly repudiated these agreements after learning they would not be approved by the NIGC. Moreover, it is the content of these agreements—the respective rights and obligations contained therein—that triggers the IGRA protective scheme, not how the parties treat such agreements. Under the statutory and regulatory scheme, management contracts must be approved by the NIGC Chairman (25 U.S.C. § 2705(a)(4)), such contracts only "become effective upon approval by the Chairman" of the NIGC (25 C.F.R. § 533.l(a)), and "[m]anagement contracts . . . that have not been approved by the . . . Chairman . . . are void" (25 C.F.R. § 533.7). Thus, if an agreement is a management contract, it must be approved by the NIGC or it is void *ab initio*. (*Catskill, supra*, 547 F.3d at pp. 127-130 ["we confront a voiding provision entrenched within a federal regulation, 25 C.F.R. § 533.7, suggesting a federal intent that, lacking the [NIGC]'s approval, contracts subject to IGRA are void *ab initio*, notwithstanding general contract principles to the contrary, like good faith"]; see also *Wells Fargo, supra*, 658 F.3d at pp. 688, 699; *First Amer. Kickapoo Operation v. Multimedia Games* (10th Cir. 2005) 412 F.3d 1166, 1168 (*First Amer. Kickapoo*).)

Consequently, it does not make a difference under the IGRA scheme whether an agreement is later repudiated, because an unapproved management contract is always void *ab initio*. And an unapproved management contract is nevertheless still a management contract within the statutory and regulatory meaning; thus, litigation related to that contract falls squarely within the preemptive force of IGRA. (See 25 U.S.C. § 2711.) Accordingly, the trial court could not determine whether Sharp Image's claims were preempted by IGRA without first determining whether the claims involved

43

management contracts or a collateral agreement to a management contract. We conclude the trial court erred in failing to determine the threshold question of whether the agreements supporting Sharp Image's claims are management contracts and a collateral agreement to management contracts.

## C. Deference to NIGC Letters

### 1. Additional Background

As noted, the trial court ruled that the Decision Letter was "not entitled to any deference," because it "was not final [agency] action and must be disregarded because it was fatally flawed." The court reasoned that the Decision Letter violated Sharp Image's due process rights because of ex parte communications between the NIGC Chairman, the Tribe's Chairman, and their attorneys. Additionally, the trial court found that the Tribe failed to submit items required for request to *approve* management contracts under part 533.3 of 25 Code of Federal Regulations, and the NIGC failed to comply with the time limits set forth in section 2711(d) of title 25 of the United States Code.[20] The trial court further found that the NIGC waived compliance with these and other procedural requirements without stating any authority permitting such a waiver. The court concluded that, "at most, the so-called 'decision' is a legal opinion which was the result

_____

[20] For example, one of the items that must be submitted along with a request for *approval* of new contracts for new operations is a three-year business plan setting forth "the parties' goals, objectives, budgets, financial plans, and related matters." (25 C.F.R. 533.3(e)(1).) In our view, the failure to adhere to these procedural matters—which are required when a tribe submits management contracts *for formal approval*—had no impact on the Chairman's ultimate conclusion that the GMA and ELA are management contracts requiring approval or his underlying reasoning. Indeed, NIGC Bulletin No. 93-3, which encourages tribes and contractors to submit agreements *for review* and determination by the NIGC as to *whether NIGC approval is required* instruct that if the NIGC determines approval is required, "the NIGC will notify the tribe to formally submit the agreement." (See fn. 10, *ante*.) It is the formal submission of the agreement *for approval* that triggers the requirements upon which the trial court erroneously focused, not the submission *for review* contemplated in NIGC Bulletin 93-3.

44

of an almost total disregard of mandated procedures and an obvious lack of due process." The court did not cite authority relevant to the specific regulatory process at issue here supporting its due process concerns.

As for the Opinion Letter authored two years earlier, the trial court rejected that advisory opinion on the grounds that it was not a final agency action. The trial court also sustained Sharp Image's hearsay objection to the Opinion Letter, because according to the trial court, it was offered "to prove the truth of the matter asserted therein," namely that "the Acting General Counsel of the NIGC was of the opinion that two of the contracts that are part of the subject litigation violate IGRA." Thus, the trial court implicitly declined to defer to, or even consider, the findings and analysis in the Opinion Letter.

Because of the NIGC's authority to promulgate regulations and preapprove agreements under IGRA, the trial court should not have simply ignored the NIGC interpretations of the statute and its own governing regulations or its application of those rules in concluding that the GMA and ELA are management contracts. As we shall explain, this does not mean that the trial court was required to accord full deference to the NIGC's opinions and conclusions. We will first consider what deference, if any, should have been given to the NIGC's interpretation of its own regulations. We next look to what deference, if any, should have been given to the opinions and reasoning in the Opinion Letter and the Decision Letter as to the management nature of the GMA and ELA.

## 2. NIGC Bulletin No. 94-5

As noted, IGRA requires that management contracts be approved by the Chairman of NIGC. (25 U.S.C. §§ 2710(d)(9), 2711(a)(1).) NIGC promulgated the regulations[21]

---

[21] "Regulations properly promulgated by the agency charged with administration of a federal statute are as much a part of federal law as the statute itself." (*Dean W. Knight &*

concerning management contracts, including the following definition of management contract: "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the *management* of all or part of a gaming operation." (25 C.F.R. § 502.15, italics added.) No definition of "management" as that term applies to "management contracts" can be found in the IGRA statutes or the NIGC regulations. However, in 1994, NIGC issued an informal interpretation of the NIGC regulations related to management contracts in Bulletin No. 94-5. The trial court here never mentioned the bulletin. Instead, it impliedly refused to defer to that interpretation by refusing to afford *any* deference to the Opinion Letter and the Decision Letter, which were based, in part, on the advisory bulletin.

In *Auer v. Robbins* (1997) 519 U.S. 452, 461 [137 L.Ed.2d 79, 90] (*Auer)*, the high court held that an agency's interpretation of its own regulation is "controlling unless it is ' "plainly erroneous or inconsistent with the regulation." ' " (*Id*. at p. 461.) Thus, under *Auer,* "wide deference" should be given "to an agency's reasonable interpretation of its own regulation." (*Public Lands for People v. Dept. of Agriculture* (9th Cir. 2012) 697 F.3d 1192, 1199 (*Public Lands*); *Bassiri v. Xerox Corp.* (9th Cir. 2006) 463 F.3d 927, 930.) " '[W]here an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling under *Auer* unless "plainly erroneous or inconsistent with the regulation." ' " (*Public Lands*, at p. 1199; *Bassiri*, at p. 930.)

Bulletin No. 94-5 provides guidance on the meaning of "management" as that term applies to "management contracts." The specific purpose of the bulletin was to answer questions and provide advice about what distinguishes a management contract

_____

*Sons, supra*, 155 Cal.App.3d at p. 305, citing *Fidelity Federal S. & L. Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153-154 [73 L.Ed.2d 664, 674-675].)

from a consulting agreement. (See fn. 11, *ante*.) To this end, the advisory bulletin noted that "management" encompasses many activities, including "planning, organizing, directing, coordinating, and controlling." According to the bulletin, "[t]he performance of any one of such activities with respect to all of part of a gaming operation constitutes management for the purpose of determining whether any contract or agreement for the performance of such activities is a management contract that requires approval." (Bulletin No. 94-5, *supra*.)[22]

Amicus United States and the Tribe contend we must afford *Auer* deference to the NIGC's interpretation of its own regulations. If such were the case, we would accord wide deference to the interpretation of the word management in Bulletin No. 94-5 and conclude that the bulletin is controlling because it is not plainly erroneous or inconsistent with the regulation. However, the discussion in Bulletin No. 94-5 is not strictly an interpretation of the NIGC regulations. "[M]anagement contract[s]" is a term in the IGRA statutes (25 U.S.C. §§ 2710(d)(9), 2711(a)(1), (3)); it is not a term that originated in the NIGC regulatory scheme. *Auer* does not apply because the bulletin actually interprets a statutory term.

Sharp Image points out that the federal courts have spoken as to the level of deference afforded to Bulletin No. 94-5. We shall follow the lead of these federal courts because we find the reasoning persuasive. (*California Assoc. for Health Services at Home v. Dept. of Health Care Services* (2012) 204 Cal.App.4th 676, 684 [lower federal

---

[22] Concerning "consulting contract[s]," Bulletin No. 94-5 notes, "An agreement that identifies finite tasks or assignments to be performed, specifies the dates by which such tasks are to be completed, and provides for compensation based on an hourly or daily rate or a fixed fee, may very well be determined to be a consulting agreement. On the other hand, a contract that does not provide for finite tasks or assignments to be performed, is open-ended as to the dates by which the work is to be completed, and provides for compensation that is not tied to specific work performed is more likely to be construed as a management contract." (Bulletin No. 94-5, *supra*.)

court decisions on federal questions are persuasive authority, although not binding on California courts].)  Rather than requiring deference, the informal pronouncements of an agency, which are not subject to agency rule-making procedures, may be accepted by a court only as they have power to persuade.  (*First Amer. Kickapoo, supra*, 412 F.3d at p. 1174, citing *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 129] (*Skidmore*); *New Gaming, supra,* 896 F.Supp.2d at pp. 1103-1104; *Machal, Inc. v. Jena Band of Choctaw Indians* (W.D.La. 2005) 387 F.Supp.2d 659, 666 (*Jena Band I*); see also *Wells Fargo, supra*, 658 F.3d at p. 696 [Bulletin No. 94-5, while not entitled to deference, "is of relevance to our inquiry"].)  In *Skidmore*, the high court considered what level of deference should be given an agency administrator's informal "policies and standards" set forth in an advisory bulletin that was utilized by the agency in its application of a statute.  (*Skidmore*, at pp. 137-140.)  While such pronouncements are not controlling upon the courts, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."  (*Id*. at p. 140.)  Given these factors and the additional circumstance that federal courts have found the analysis in Bulletin No. 94-5 persuasive, we conclude the bulletin has significant persuasive power.

### 3.  The Opinion and Decision Letters

Amicus United States argues that *Auer* deference should also be afforded to the Opinion Letter and Decision Letter determination that the GMA and ELA are management contracts.  Again, we disagree.  In writing those letters, NIGC was not interpreting its own regulations; rather it was applying its regulations and interpretation thereof to a particular set of circumstances.

48

Federal courts apply the same level of deference given to an agency's informal interpretations of statute to informal advisory letters of NIGC; they apply limited *Skidmore* deference. (*Catskill, supra*, 547 F.3d at p. 127 [opinion letter of NIGC General Counsel's Office]; *First Amer. Kickapoo, supra*, 412 F.3d at p. 1174 [same].) Such a letter "is entitled to deference only to the extent that is has the power to persuade us." (*Catskill*, at p. 127.) Again, we find this approach persuasive and follow the lead of the federal courts.

The Decision Letter presents a different consideration. It is arguably a final agency action. But Sharp Image complains the decision-making process is tainted by the Tribe's active solicitation of the NIGC's opinions and its ex parte meeting with the Chairman while litigation was pending. It contends that the NIGC letters do not warrant "any deference because [they are] infected with both procedural and substantive error."[23]

---

[23] Sharp Image cites *Citizens Action League v. Kizer* (9th Cir. 1989) 887 F.2d 1003, 1007, for the proposition that "NIGC letters solicited and procured by the Tribe to help it defend [a] lawsuit are entitled to limited or no deference." *Kizer* has no application here. The discussion upon which Sharp Image relies from that case relates to the rulings of the district court, with which the circuit court apparently agreed. (*Ibid.*) The district court expressly found the letter, prepared during and for the litigation, " 'lack[ed] . . . indicia of deliberative administrative review.' " (*Ibid.*) The district court further concluded that the subject matter of the letter was not one in which the agency possessed "specialized expertise or one which was beyond judicial competence; indeed, the letter discusse[d] statutory construction of a legal term, a task particularly well-suited for courts." (*Ibid.*) It also found that the letter's "pronouncements are not ones of long standing." (*Ibid.*) None of these circumstances are present in the instant case. The NIGC possesses specialized expertise. Moreover, it has made similar determinations in other cases, using similar reasoning. As we discuss *post*, NIGC's position appears to be consistently applied. We also note that it does not appear from the opinion in *Kizer* that the opposing party in that litigation had an opportunity to comment on the agency's letter, whereas here, Sharp Image had the opportunity to provide substantive comments on the management nature of the agreements to the NIGC Chairman long before the Decision Letter was issued.

49

Also, the regulations provide a mechanism for appeal to the full commission, but even though Sharp Image made the request, that did not happen here due to the inability to achieve a quorum. Although the regulations appear to contemplate the full commission might not act on such appeals, making the Chairman's decision the decision of NIGC (see fn. 16, *ante*), it is not clear whether under the circumstances here, a Chairman's decision should be afforded the same deference as the NIGC's final agency action. (See *Saint, supra*, 451 F.3d at p. 51 [decision of NIGC is a final agency action]; *AT&T, supra*, 295 F.3d at pp. 905, 908 [same].) We need not make that determination, because when we afford the same limited deference to the opinion and reasoning in the Decision Letter as we do to the Opinion Letter, we arrive at the same result. We afford the Decision Letter deference to the extent that is has the power to persuade us, and as we explain *post*, the Decision Letter coincides with our view that ELA is a management contract.

We reject Sharp Image's argument that we should essentially ignore the NIGC letters. First, as we have noted, both the General Counsel and the Chairperson relied on Bulletin No. 94-5, an advisory bulletin produced outside the context of this litigation. We find the definition of management activities therein—planning, organizing, directing, coordinating, and controlling—to be consistent with a common understanding of such activities. We also agree with the observation in the bulletin that the performance of any one of such activities with respect to all or part of a gaming operation can constitute

---

We also note that NIGC has solicited inquiries like the one made by the Tribe here for a long time. Bulletin 93-3, published while the general counsel was Cox, who later provided legal representation for Sharp Image, tells tribes and contractors that consulting and leasing agreements should be submitted to NIGC for review. (See fn. 10, *ante*.) We also note that in a letter dated June 1, 1999, the Tribe told Sharp Image it intended to "formally request a written opinion from the [BIA]." And in his letter of June 9, 1999, Cox, while counsel for Sharp essentially invited the Tribe to consult with NIGC when he wrote, "The Tribe is, of course, free to submit these Agreements for review by the NIGC and the BIA."

management for the purpose of determining whether an agreement for the performance of such activities is a management contract requiring NIGC approval. Indeed, Sharp Image does not dispute this interpretation or offer any other interpretation. Second, it does not appear that the NIGC has taken a position on the agreements here or employed an analysis in this case that is different from what it has done in other cases.

For example, in *Gallegos, supra*, 955 F.Supp. 1348, the NIGC was asked to review an agreement involving leasing provisions similar to those here. The contract in *Gallegos* granted the lessor exclusive rights to provide slot machines to a tribal casino for five years and forty percent of the net proceeds from each machine as rent.[24] (*Id.* at p. 1349.) Upon the submittal of the agreement in 1996 to the NIGC to determine whether it was a management contract, the matter was reviewed and an opinion letter authored by Coleman later that year, who was at that time Associate General Counsel. (*Ibid.*) She opined that the agreement was a management contract. (*Ibid.*)

*New Gaming, supra*, 896 F.Supp.2d 1093, is remarkably similar to the instant case factually and procedurally. Like here, it involved a leasing agreement and a promissory note. (*Id.* at p. 1096.) Following the suggestion in Bulletin No. 93-3 (see fn. 10, *ante*), the tribe sent the agreements to NIGC for a determination as to whether they constituted management contracts requiring approval. These submissions were made in 2003 and 2004. (*Id.* at p. 1096 & fn. 4.) In 2004, well before the litigation in the instant case, Coleman, Acting General Counsel at the time, authored an informal opinion in which she concluded the lease and note constituted a management contract. (*Id.* at p. 1096.) Thereafter, the tribe terminated the agreements, which was followed by New Gaming's

---

[24] Two provisions in the *Gallegos* agreement were different from the agreements in the instant case. Under the lease in that case, Gallegos's business was allowed to set the payout rate and maintain the books and records for the machines. (*Gallegos, supra*, 955 F.Supp. at p. 1349.)

lawsuit for breach of the lease and note. (*Id.* at pp. 1096-1097.) Like here, while the litigation was pending, the tribe requested a final agency determination as to whether the agreements constituted a management contract under IGRA, and the NIGC invited comment by both parties. (*Id.* at p. 1097.) The request was made in 2007 and in 2008, about a year after the litigation in the instant case commenced, the NIGC Chairman issued a decision concurring with the informal opinion authored by Coleman and concluding that the equipment lease and promissory note constituted a management contract. (*Ibid.*)

The specific lease provisions are not set forth in detail in the *New Gaming* opinion. However, in addressing New Gaming's void for vagueness claim related to the failure of the regulations to define " 'management,' " the court indicated that the main reason NIGC had concluded the combination of the lease and note in that case was a management contract was because under the lease, New Gaming had the right to determine the type or mix of the gaming machines on the casino floor. (*New Gaming, supra*, 896 F.Supp.2d at p. 1100.) Under the GMA and ELA, Sharp Image had similar rights. However, unlike here, where Sharp Image has the right to choose *all of the machines*, the lease in *New Gaming* actually provided slightly more control to the tribe. Under the lease, New Gaming was to provide 80 percent of the machines with the remaining 20 percent to be provided by other manufacturers agreed upon by the parties. The lease expressly stated, "The exact mix of the machines that [New Gaming] [was to] make available [was to] be agreed upon by the parties." (*Id*. at pp. 1100, fn. 13, 1102.) As noted in the court's opinion, Coleman concluded, " '[c]hoosing the mix of machines on the casino floor is an essential management function.' " (*Id*. at p. 1102.) This was a significant reason why both the Opinion Letter and Decision Letter here concluded the GMA and ELA are management contracts.

*Gallegos* and *New Gaming* demonstrate that the NIGC has applied the same analysis to arrive at similar opinions in similar cases that predated the litigation in this

case. While the NIGC's pronouncements in informal opinions are not controlling, they do constitute "a body of experience and informed judgment" to which "courts . . . may properly resort for guidance." (*Skidmore, supra*, 323 U.S. at p. 140.) Given the "thoroughness evident" in the NIGC reasoning here and the apparent "consistency with earlier . . . pronouncements" (*ibid.*), we conclude that the Opinion Letter and the Decision Letter have persuasive power. Both letters thoroughly analyzed the agreements under IGRA, the salient case law, and applied the interpretation in the NIGC's cornerstone bulletin on management contracts, Bulletin No. 94-5.

Citing Bulletin No. 94-5, the Opinion Letter opined that the GMA and ELA gave Sharp Image exclusive control over the gaming equipment to be provided at the casino and a high rate of compensation—both indicia of a management contract. It further opined that "[t]he agreements show that [Sharp Image] seeks to use the Tribe's gaming facilities as a long term venue where [Sharp Image] is the exclusive supplier of machines and derives a majority of the profit." It further reasoned that if the agreements were enforced, they would give Sharp Image "a fee equaling thirty percent (30%) of adjusted gross revenue because they define 'net revenue' not as IGRA does but rather as all gross revenues received by the Tribe of all machines or table games minus all jackpots or payouts. [¶] . . . Consequently, the majority of the benefit of [the] Tribe's gaming would be conveyed to [Sharp Image]." Regarding Sharp Image's exclusivity right, the Opinion letter noted that under the ELA, the Tribe would be "beholden" to Sharp Image for all of its gaming machines and software and that Sharp Image effectively had a "veto over the number and kind of machines the Tribe may offer." Under the circumstances, the ELA provided Sharp Image with "de facto management ability." Thus, the Opinion Letter concluded that the ELA violated IGRA's mandate that "[t]ribes, not machine vendors, are supposed to be the primary beneficiaries of Indian gaming. 25 U.S.C. § 2702(2)."

After both parties provided written arguments that were considered by the NIGC Chairman, he issued a formal opinion in the Decision Letter. In the Decision Letter, the Chairman determined that the GMA and ELA individually are management contracts. The Decision Letter expressly referenced Bulletin No. 94-5 and adopted the analysis of the Opinion Letter, concluding that both the ELA and GMA provided Sharp "broad operational control sufficient to make them management contracts." Specifically, the Decision Letter noted that the ELA and GMA gave Sharp Image "the exclusive right to provide gaming machines for all of the casino floor space," observing that "[f]reedom to configure the gaming floor, the essence of managing a casino, is not in the control of the [Tribe]."

We conclude that the Opinion Letter and Decision Letter are persuasive and consider the opinions and reasoning therein in our determination as to whether the agreements at issue are a management contract and a collateral agreement to a management contract.

### D.  The Status of the Agreements under IGRA

### 1.  The GMA and ELA -- Management Contracts

Before we set forth the reasoning for our independent determination that the GMA[25] and ELA were management contracts, we note that an agreement need not completely strip a tribe of decision-making authority before it can be characterized as a management contract under IGRA. (*First Amer. Kickapoo, supra*, 412 F.3d at p. 1175.) Rather, the regulations' definition of a management contract is an agreement that provides for the management of " '*all or part*' of a gaming operation" (italics added), and this characterization "suggests a definition of management that is partial rather than

---

[25]  Even though Sharp Image elected not to pursue claims related to the GMA, that agreement is still relevant to our discussion because of its connection to the ELA and Note.

54

absolute, contingent rather than comprehensive." (*Ibid.*) Thus, even when an agreement relates principally to just one aspect of the casino's operation, such as its gaming machines, that can be sufficient under both the regulations and case law for the agreement to be governed by the IGRA. (*New Gaming, supra*, 806 F.Supp.2d at p. 1102; see also *Wells Fargo, supra*, 658 F.3d at pp. 694-699.)

We recognize that in the ELA, the parties disclaimed any intent to enter into a management contract. "However, the parties' expressed intent is not controlling when the agreement they executed, due to the rights and obligations it created is a management contract. An agreement's status as a 'management contract,' or not, is determined by the substance of the agreement, not the label the parties attach to it." (*New Gaming, supra*, 896 F.Supp.2d at p. 1104, fn. omitted.)

As we have noted, Bulletin No. 94-5 defines management broadly to include "planning, organizing, directing, coordinating, and controlling . . . all or part of a gaming operation." (Bulletin No. 94-5, *supra*.) Any one of these activities may constitute management. The provision in the GMA providing that Sharp Image would maintain the responsibility for promotions and "provide direction for the General Manager in this department" was alone sufficient to find management of part of the gaming operation.

In addition to defining management, "The Bulletin singles out seven management activities as especially probative of the question whether an agreement is a management contract. [Citation.] An agreement need not include all seven activities to be a management contract; the 'presence of all or part of these activities in a contract with a tribe strongly suggests that the contract or agreement is a management contract requiring [NIGC] approval.' " (*First Amer. Kickapoo, supra*, 412 F.3d at p. 1174; accord, *New Gaming, supra*, 896 F.Supp.2d at p. 1104.) The GMA and ELA contain at least four of the seven management activities that the bulletin identifies as highly suggestive of a management agreement: provisions for accounting procedures, development and construction financed by a non-tribal party, a contractual term that establishes an ongoing

55

relationship between a tribe and non-tribal party, and compensation based on a percentage fee. (See Bulletin No. 94-5, *supra*.)[26] Similar to the courts in *First American Kickapoo* where the court identified five such activities (*First Amer. Kickapoo*, at p. 1174) and *New Gaming*, where the court also identified five activities from the list (*New Gaming*, at p. 1104), we conclude that the presence of the four out of seven activities present here is strong indicia of a management contract.

Our conclusion that the GMA and ELA constitute management contracts is "reinforced by the fact that [they do] not much resemble a consulting agreement." (*First Amer. Kickapoo, supra*, 412 F.3d at p. 1174; see fn. 22, *ante*.) Nor do the agreements resemble a traditional lease. The GMA and ELA were open-ended agreements for gaming machine rentals in exchange for a thirty percent of the casino's "net revenues." The GMA defines " '[n]et [r]evenues' " as "all gross revenues received by the Tribe in connection with its operation of all Machines *or table games* on the Casino premises or Reservation, minus all jackpots or payouts made through such Equipment." (Italics added.) Similarly, the ELA defines " '[n]et revenues' " as "gross gaming revenues from *all gaming activities*, which are solely related to the operation of Video Gaming/Pulltab devices *and card games*, less all prizes, jackpots and payouts." (Italics added.) Accordingly, both agreements provided that Sharp Image would receive thirty percent of the net revenues from not only the leased gaming machines but also other table or card games in the casino. We find that this provision, which provides compensation other

---

[26] The three other activities from the bulletin are: access to the gaming operation by tribal officials (which we understand to mean a specific provision in the agreement requiring such access); payment of a minimum guaranteed amount to the tribe; and provision for assignments or subcontracting of responsibilities. (See Bulletin No. 94-5, *supra*.)

than from revenue related to the leased machines, goes beyond a traditional lease agreement for equipment and is further indicia of a management contract.[27]

Additionally, the agreements did not contain an express provision allowing the Tribe to determine the exact mix of the machines and the floor configuration of the casino or to even participate in making that decision. Instead, the agreements gave Sharp Image control of the number of gaming machines, the "hardware, software, and signage" for the gaming machines, and signage to be placed throughout the casino. Additionally, Sharp Image selected machines it placed in its inventory and it was from this inventory that machines would be made available for the casino. Selecting and providing gaming equipment is "planning, organizing, directing, coordinating, and controlling" (Bulletin No. 94-5, *supra*) an essential aspect of casino operations. Under both the GMA and ELA, Sharp Image had "the *exclusive* right to lease or otherwise supply additional gaming devices to [the Tribe] to be used at its existing or any future gaming facility or facilities" in addition to the original 400 machines it was to provide. This meant that the

---

[27] Sharp Image contends that on its face the ELA is a lease for gaming equipment and leases for equipment are not management contracts. It relies on *In re U.S. ex rel. Hall* (1993) 825 F.Supp. 1422, a case that Sharp Image acknowledges involved section 81 of title 25 of the United States Code, not IGRA. In examining the section 81 requirement that agreements within the scope of that statute pertain to services "relative to Indian lands," the court in *Hall* stated, "*these* contracts do not relate to the management of a facility on Indian lands. A *mere* sale or *lease of equipment* clearly is not management." (*Hall*, at p. 1433, italics added.) *Hall* does not help Sharp Image here. First, the reference to "these contracts" makes clear that the district court was referring to the specific contracts in *Hall*, not equipment leases in general, and because the specifics of the *Hall* agreements were not detailed in the opinion, we can make no comparison to the agreements at issue in the instant case. Second, while we have no disagreement with the statement that generally, a *mere* lease of equipment is not management, what we have here are not *mere* leases. Third, where gaming management agreements and collateral agreements are concerned, IGRA superseded section 81. (*Saint, supra*, 451 F.3d at pp. 52-53.) Consequently, we look to the IGRA statutes, regulations, and the reasoning we have found persuasive in Bulletin No. 94-5 in determining whether the agreements at issue in this case are subject to IGRA.

Tribe would have been stuck with whatever machines Sharp Image provided. No replacement machines could be obtained from any other vender, even if the machines Sharp Image provided or could provide from its inventory were unpopular, had fallen into disrepair, and/or lagged behind technology advancements. As noted in the Opinion Letter, there is nothing in the agreements to prohibit Sharp Image from *refusing* to provide different or updated machines. Even after the five-year term, the Tribe would have been required to use only the machines Sharp Image had provided for an additional two years unless the Tribe purchased those machines, which again, could have been outdated or in disrepair by that time. And if the Tribe wanted to change the payout at anytime, it was dependent upon Sharp Image to change the software payout percentages. Sharp Image may or may not have had the software and even if it did, there was nothing in the agreements requiring Sharp Image to provide it. Thus, we agree with the Opinion Letter when it noted Sharp Image "effectively has a veto over the number and kind of machines the Tribe may offer." And we agree with the NIGC Chairman when he concluded in the Decision Letter that the ELA and GMA gave Sharp Image "the exclusive right to provide gaming machines for all of the casino floor space" as well as the "[f]reedom to configure the gaming floor." We further agree that this appears to be "the essence of managing a casino" and alone was "sufficient to make both agreements management contracts."

Our decision is reinforced by the analysis in *New Gaming, supra*, 896 F.Supp.2d 1093. As we have noted, the lease term concerning the provision of gaming machines was in that case actually less restrictive than the lease at issue here. The court determined that the combination of the lease and note at issue in that case was a management contract, even though the lease actually provided the tribe more control than here by allowing it to obtain twenty percent of its gaming machines from other venders and further expressly providing that the exact mix of machines was to be agreed upon by the parties. (*Id.* at p. 1102.) Agreeing with the informal NIGC opinion, the court concluded

58

that "[t]he right to participate in game selection altered [New Gaming System]'s role from that of equipment supplier to manager of at least one aspect of the Nation's gaming operation." (*Id.* at pp. 1102-1103.)

We also note, as did the NIGC in this case, that the ELA gave Sharp Image the right to inspect the books. In addition, we further note that in the event of an audit, Sharp could select the auditor if the parties could not agree on who would conduct the audit. This was further indicia of control over the Tribe's gaming operations.

So too were the default provisions. In the event of default by the Tribe, the ELA contained a list of remedies available to Sharp, but no events of default or remedies are set forth for the Tribe in the event of a default by Sharp. For example, there was no express remedy under the ELA for the Tribe if Sharp Image failed to deliver and keep 400 gaming machines or any number of machines in the casino throughout the life of the lease. We agree with the Opinion Letter. The "one-sided" default and remedy provisions are further indications of Sharp Image's ability to control the gaming activity in the Tribe's casino.

The level of control, the term of the agreement, and the amount of and percentage formula for compensation lead us to conclude that the GMA and ELA were unapproved management contracts subject to IGRA. While Bulletin No. 94-5, the Opinion Letter and the Decision Letter "do not compel our deference, they do offer confirmation of our conclusion." (*First Amer. Kickapoo, supra*, 412 F.3d at p. 1174 [concluding that while the Bulletin and an informal opinion letter from the NIGC general counsel did not compel deference, they offered confirmation of the court's conclusion that the lease at issue was a management contract].)

"Congress wrote in broad strokes in crafting [IGRA]," to "ensure that the tribes retain control of gaming facilities set up under the protection of IGRA and of the revenue from these facilities." (*Wells Fargo, supra*, 658 F.3d at pp. 695, 700.) Giving full effect

59

to congressional intent further compels the conclusion that the GMA and ELA are unapproved management contracts subject to the preemptive force of IGRA.

## 2. The Note -- Collateral Agreement to a Management Contract

Having concluded that the GMA and ELA are unapproved management contracts, we must address whether the Note is a collateral agreement to a management contract and thereby also subject to IGRA regulation. The tribe never submitted the Note to NIGC. Consequently, the Opinion Letter and Decision Letter did not address the Note executed contemporaneously with the ELA.

IGRA provides that management contracts "shall be considered to include all collateral agreements to such contract that *relate to the gaming activity*." (25 U.S.C. § 2711(a)(3), italics added.) The definition of the term "collateral agreement" can be found in the definitions part of the regulations. There, "[c]ollateral agreement" is specifically defined to mean "any contract, whether or not in writing, *that is related, either directly or indirectly, to a management contract*, <u>or</u> *to any rights, duties or obligations created between a tribe* (or any of its members, entities, or organizations) *and a management contractor* or subcontractor (or any person or entity related to a management contractor or subcontractor)." (25 C.F.R. § 502.5, italics added & underscoring.) The use of the conjunction "or" we have underlined suggests two separate varieties of collateral agreements: (1) a written or oral contract that is directly or indirectly *related to* a "management contract," or (2) a written or oral contract that is directly or indirectly *related to* "any rights, duties or obligations created between a tribe . . . and a management contractor." A separate provision in the definitions part of the regulations defines management contract to mean "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." (25 C.F.R. § 502.15.) The manifest purpose of the collateral agreement provisions is to ensure that all the rights and liabilities of tribes and

60

management contractors (or subcontractors) with respect to a gaming operation are jointly considered as comprising the relevant "management contract," notwithstanding the labels parties attach to the agreements. Otherwise, parties could subvert IGRA by splintering relevant obligations into separate agreements.

As we have noted, Anderson explained the ELA and Note to the Tribe in his letter of June 18, 1997. There, he wrote, "These instruments . . . represent *a more complete agreement* between Sharp Image Gaming, Inc. and the Shingle Springs Rancheria." (Italics added.) His reference to the word "agreement" (singular) indicates the intent that the ELA and Note be viewed together. Anderson further explained, "These instruments incorporate the points of the original agreement, but further address some points that benefit both parties in having formalized. The promissory note . . . incorporates the total amount owed as of May 31, 1997." The GMA had expressly stated that the repayment terms for monies advanced would be "set forth at a later date." Thus, the Note related to liabilities previously incurred under the GMA and liabilities to be incurred in the future in connection with the ELA, both of which we have determined are management contracts.

As the *Wells Fargo* court noted, neither the statutory nor the regulatory scheme provide an exemption for financing agreements that contain provisions related to management of a gaming facility. (*Wells Fargo, supra*, 658 F.3d at p. 697.) This is not a surprise, given the purposes of IGRA. (*Ibid.*) Instead, in our view, IGRA and the regulations cover financing agreements that are collateral agreements to a management contract.[28]

---

[28] IGRA also covers leases and promissory notes that combined, constitute one management contract. (See *New Gaming, supra*, 896 F.Supp.2d at p. 1105.) The Tribe and amicus argue that the Note is a collateral agreement to the ELA, but the Tribe also argues that the Note became " 'constructively a part of the [ELA]' " and amicus also argues the two agreements are effectively one contract. We need not decide whether the two agreements are actually one contract, because we conclude the Note is a collateral agreement to the ELA and thereby subject to regulation under IGRA.

The Note does not stand on its own; rather it relates to the gaming activity and the management contracts. The Note provides that the total amount previously invested to develop Crystal Mountain Casino was $3,167,692.86. The Note states this was "the full amount owed up to September 30, 1997," and that the "principal sum" of the Note was "not to exceed" this amount. The Note further provides that the Tribe would repay sums advanced by Sharp Image to develop the Crystal Mountain Casino, and future sums advanced for casino development, at an annual interest rate of 10 percent.

The Note also expressly references the 400 video gaming devices in the ELA twice. First, the Note states that the initial payment on the Note was to be made two months after delivery and installation of the machines. Second, the Note provides that if the Tribe is unable to make the monthly payments on the Note, but is able to continue to operate the casino without operating at a loss, "the [Tribe] shall then be allowed to make a minimum payment equal to 25% of the gross net revenues it receives from the operation of the video gaming devices . . . until the note is paid in full." Similar to, but not the same as the GMA and ELA, gross net revenue is defined in the Note as "all monies paid in by players less jackpots and payouts."[29] In other words, if the Tribe is unable to make the monthly payments on the Note, Sharp Image could then be paid twenty-five percent of the "gross net revenues" from all of the gaming on top of the thirty percent it would receive under the ELA for the machines and card games, and the Tribe would still have to pay operating expenses for the casino. Thus, the Note defines a key part of the financial relationship between the parties with respect to casino development and tribal gaming operations, as well as the gaming machines Sharp Image was to

---

[29] The note did not limit the "monies paid in by players" to players on the machines Sharp Image provided and thus appears to also include players of *any* gambling activities offered at the casino, including card and table games.

62

provide under the ELA. And it provides Sharp Image with the potential to collect nearly all of the net revenues for all gaming activities until the note is paid off.

Sharp Image argues that the Note is not subject to IGRA's approval requirement because the Note does not itself provide for the management of all or part of the gaming operation. In support of its position, Sharp Image cites *Catskill, supra*, 547 F.3d at page 130 and *Wells Fargo, supra*, 658 F.3d at pages 700-702, which rely on *Jena Band I, supra*, 387 F.Supp.2d 659 and *Jena Band of Choctaw Indians v. Tri-Millennium* (W.D.La. 2005) 387 F.Supp.2d 671 (*Jena Band II*),[30] respectively. Both of the *Jena Band* cases were decided by the same district court judge. That district court reasoned that a collateral agreement is not subject to the statutory screening and approval requirement unless the collateral agreement *itself* meets the definition of management contract. (*Jena Band I*, at pp. 666-667; *Jena Band II*, at p. 678.) The court reached this conclusion by its reading of part 502.15 of 25 Code of Federal Regulations, the definition of management contracts. As we have noted, that provision reads: "Management contract means any contract, subcontract, *or collateral agreement* between an Indian tribe and a contractor or between a contractor and a subcontractor *if such contract or agreement provides for the management of all or part of a gaming operation*." (Italics added.) Piecing together the italicized language in the definition of management contract, the district court concluded that even if the agreement is a collateral agreement, pursuant to part 502.5 of 25 Code of Federal Regulations, NIGC approval would not be required unless such collateral agreement itself *provides for the management of all or part of a gaming operation*. (*Jena Band I*, at pp. 667-668; *Jena Band II*, at p. 678.)

Beyond the language of the definition of management contract in the regulation, the district court in *Jena Band I* and *Jena Band II* also reasoned that IGRA's policy of

---

[30] See *Wells Fargo, supra*, 658 F.3d at p. 701, fn. 16, for its reliance on *Jena Band II*.

providing for " 'tribal economic development, self-sufficiency, and strong tribal governments' " also supported its conclusion that only collateral agreements that provide for the management of gaming operations are void if not preapproved by NIGC. (*Jena Band I, supra*, 387 F.Supp. at p. 667; *Jena Band II, supra*, 387 F.Supp.2d at p. 678.) The district court reasoned that requiring pre-approval of collateral agreements that merely relate to gaming without also including management related provisions would make it more difficult for potential investors to contract with Tribes and thus tribal economic development would be inhibited. The court wrote, "By making it easier for tribes to obtain financial backing, we make it easier for tribes to acquire the economic development and self-sufficiency that accompanies the income from tribal gaming operations." (*Ibid*.)

We disagree with the interpretation of the regulations originating in the *Jena Band* cases, because it would render the term "collateral agreement" in both the statute and the regulation defining collateral agreement mere surplusage. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1010 [holding that "interpretations that render statutory terms meaningless as surplusage are to be avoided"].) If a collateral agreement must independently meet the definition of "[m]anagement contract" under 25 Code of Federal Regulations part 502.15 to fall within IGRA's pre-approval requirement, the statutory inclusion of "all collateral agreements . . . *that relate to the gaming activity*" would be rendered a nullity. (See 25 U.S.C. § 2711(a)(3)), italics added.) Likewise, the separate definition of "collateral agreement" in 25 Code of Federal Regulations part 502.5 would also be meaningless surplusage. As we have noted, the definitional language of that regulation appears to contemplate two varieties of collateral agreements: (1) a written or oral contract that is directly or indirectly *related to* a "management contract," or (2) a written or oral contract that is directly or indirectly *related to* "any rights, duties or obligations created between a tribe . . . and a management contractor." (25 C.F.R. § 502.5.) Notably, that definition does not include a requirement that a collateral

64

agreement itself provide for the management of all or part of the gaming operation. If the *Jena Band* interpretation is correct, there simply would be no need to reference collateral agreements in the statute or to include a separate definition thereof in 25 Code of Federal Regulations part 502.5 if such an agreement must also be a management agreement to be subject to IGRA. The only consideration as to any agreement would be whether it "provides for the management of all or part of a gaming operation" by itself. (25 C.F.R. § 502.15.) We decline to read the IGRA statutory and regulatory provisions in a way that would render the aforementioned provisions surplusage.

Further, the *Jena Band* interpretation ignores the regulatory context and the plain meaning of the term "collateral" as used in section 2711(a)(3) of title 25 of the United States Code. By authorizing the NIGC to regulate management agreements inclusive of all collateral agreements *that relate to the gaming activity*, we conclude from this plain language that Congress intended to extend IGRA's reach to all instruments and agreements that become subject to regulation by virtue of their relationship to management contracts or management contractors when all relevant agreements are read together.

As for the *Jena Band* court's separate reason for its reading of the regulatory text—the notion that the policy of advancing tribal economic development is fostered by providing greater opportunity for investors to provide financial backing for tribal gaming—we disagree with that reasoning as well. First, we note that the district court cited no authority supporting its view that requiring regulatory approval of collateral agreements related to gaming activity would stifle non-tribal investment. Second, even if investment would be chilled, other provisions in IGRA and the NIGC regulations can be read as making involvement in tribal gaming by non-tribal entities and persons more difficult as well. Indeed, regulation inevitably makes it more difficult for those who would be regulated to engage in regulated activities. And it is up to the Congress and the regulators, not the courts to strike the policy balance. Third, if financing agreements that

65

relate to gaming activity must also be management contracts before NIGC approval is required, IGRA could be circumvented by setting forth financial obligations in separate instruments. This, of course, could potentially undermine the economic development purpose as well as the other purposes of IGRA, including providing a shield against corrupting influences, ensuring that tribes are the primary beneficiaries of the gaming operations, and protecting gaming as a means of generating tribal revenue. (25 U.S.C. § 2702(2)-(3).) Further, if the "comprehensive review" that constitutes the core of Congress's protection for Indian gaming establishments does not apply to such agreements, loss of tribal control over gaming operations could result and thus the fundamental purpose of the federal regulatory scheme impaired. (See *Wells Fargo, supra*, 658 F.3d at p. 700.)

As we have noted, the ELA and the Note were proposed together, considered together, and executed together. The ELA and Note were both entered on the day of the Tribal Council meeting, November 15, 1997, with Anderson's express purpose of replacing the prior GMA. Significantly, the Note both references the prior debt apparently accrued under the defunct GMA and is expressly contingent upon the installation of gaming machines under the ELA. Thus, the key terms of the Note are expressly dependent on the gaming activity under the unapproved management contracts. These factors demonstrate that the Note is indeed a collateral agreement to a management contract that "relate[s]  to the gaming activity." (25 U.S.C. § 2711(a)(3); 25 C.F.R. § 502.5).

Our rejection of the regulatory interpretation in *Jena Band* does not mean that all unapproved agreements collateral to unapproved management contracts are necessarily void. (See *Catskill, supra*, 547 F.3d at p. 130, fn. 20.) However, where, as here, the terms of the collateral agreement are connected to the gaming activity provisions of the management contracts (the GMA and the ELA), the collateral agreement "relates to the gaming activity" under IGRA and falls within both definitions of collateral agreements in

66

the regulation defining such agreements.  (25 U.S.C. § 2711(a)(3); 25 C.F.R. § 502.5.) Because the collateral agreement was not approved by the NIGC Chairman, it is subject to IGRA preemption.

## III.  Conclusion

The federal circuit court in *First American Kickapoo* noted that, "[n]on-tribal parties who enter into contracts relating to tribal gaming undertake, in addition to ordinary business risks, certain regulatory risks as well."  (*First Amer. Kickapoo, supra*, 412 F.3d at pp. 1178-1179.)  As in *New Gaming*, the instant case "illustrates the accuracy of that observation."  (*New Gaming, supra*, 896 F.Supp.2d at p. 1105.)  Because we conclude that both the unapproved ELA and unapproved Note are agreements subject to the IGRA requirement for NIGC approval, Sharp Image's contractual claims under both agreements are preempted by IGRA and the trial court lacked subject matter jurisdiction to adjudicate these claims.

Accordingly, we reverse.

## DISPOSITION

The judgment is reversed, and the trial court is directed to dismiss the action on remand.  Sharp Image shall pay the Tribe's costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(1), (5).)


                                           MURRAY        , J.

We concur:


NICHOLSON     , Acting P. J.


DUARTE        , J.